HARLES VATTIER, APPELLANT v. THOMAS S. HINDE, JAMES
B. HINDE, MARTHA HINDE, AND JOHN M. HINDE, INFANTS
&c.

bill was filed in the circuit court of Ohio, claiming a conveyance of cer-
tain real estate in Cincinnati from the defendants, and after a decree in
favour of the complainants, and an appeal to the supreme court, the de-
cree of the circuit court was reversed, because a certain Abraham Gar-
rison, through whom one of the defendants claimed to have derived title,
had not been made a party to the proceedings, and who was, at the time
of the institution of the same, a citizen of the state of Illinois, although
the fact of such citizenship did not then appear on the record. After-
wards, a supplemental bill was filed in the circuit court, and Abraham
Garrison appeared and answered, and disclaimed all interest in the case :
whereupon the circuit court, with the consent of the complainants, dis-
missed the bill as to him. By the court. If the defendants have distinct
interests, so that substantial justice can be done by decreeing for or
against one or more of them, over whom the court has jurisdiction, with-
out affecting the interests of others, its jurisdiction may be exercised as
to them. If, when the cause came on for hearing, Abraham Garrison had
still been a defendant, a decree might then have been pronounced for
or against the other defendants, and the bill have been dismissed as to
him, if such decree could have been pronounced as to them without
affecting his interests. No principle or law is perceived which opposes
this course. The incapacity of the court to exercise jurisdiction over
Abraham Garrison, could not affect their jurisdiction over other defend-
ants, whose interests were not connected with his, and from whom he
was separated, by dismissing the bill as to him.

The cases of Nollan et al. v. Torrance, 9 Wheat. Rep. 537 ; Connolly et al.
v. Taylor, 2 Peters, 556; and Cameron v. M'Roberts, 3 Wheat. Rep. 591,
cited and affirmed.

It is the settled practice in the courts of the United States, if the case can
be decided on its merits, between those who are regularly before them,
although other persons, not within their jurisdiction, may be collaterally
or incidentally concerned, who must have been made parties if they had
been amenable to its process, that these circumstances shall not expel
other suitors who have a constitutional and legal right to submit their case
to a court of the United States ; provided the decree may be made with-
out affecting their interests. This rule has also been adopted by the
court of chancery in England.

Where the new parties to a proceeding in chancery are the legal represent-
atives of an original party, and the proceedings have been revived in their
names, by the order of the court on a bill of revivor ; the settled practice
is to use all the testimony which might have been used if no abatement

[Vattier v. Hinde.]

had occurred. The representatives take the place of those which they represent, and the suit proceeds in a new form, unaffected by the change of name.

Agreements had been made, under which depositions taken in other cases where the same questions of title were involved, should be read in evidence, and on the hearing in the circuit court these depositions were read: afterwards, on an appeal to this court, the decree of the circuit court was reversed, and by the decree of reversal the parties were permitted to proceed de novo. When the case was again heard in the circuit court the defendant objected to the reading of the depositions, asserting that the decree of reversal annulled the written certificate of the parties for the admission of testimony. By the court. The consent to the depositions was not limited to the first hearing, but was co-extensive with the cause. The words in the decree of reversal, that the parties may proceed de novo, are not equivalent to a dismission of the bill without prejudice; nor could the court have understood them as affecting the testimony in the cause; or setting aside the solemn agreement of the parties. The testimony is still admissible to the extent of the agreement.

The rules of law respecting a purchaser without notice, are formed for the protection of him who purchases a legal estate, and pays the purchase money without a knowledge of the outstanding equity. They do not protect a person who acquires no semblance of title. They apply fully, only, to the purchaser of the legal estate. Even the purchaser of an equity is bound to take notice of any prior equity.

The bill set forth a title in B. H., the wife of T. H., by direct descent from her brother to herself, and insisted on this title to certain real estate. The answer of the defendants resisted the claim, because the land had been conveyed by the complainants before the institution of the suit to A. C. The complainant in his replication admitted the execution of the deed to A. C., but averred that it was made in trust to reconvey the lot to T. H., to be held by him for the use and benefit of B. H., his wife and her heirs, and to enable T. H. to manage and litigate the said rights; and that A. H., in execution of the trust, made a deed to T. H. The deed was recorded, and was exhibited, but it did not state the trust. The rules of the court of chancery will not permit this departure in the replication from the statements of the bill.

The act for regulating processes in the courts of the United States, provides that the forms and modes of proceeding in courts of equity, and in those of admiralty and maritime jurisdiction, shall be according to the principles, rules and usages which belong to courts of equity and to courts of admiralty, respectively, as contradistinguished from courts of common law, subject, however, to alterations by the courts, &c. This act has been generally understood to adopt the principles, rules and usages of the court of chancery of England.

APPEAL from the circuit court of the United States for the district of Ohio.

[Vattier v. Hinde.]

This case was before the court at January term 1828, 1 Peters, 241, on an appeal by the parties who are now appellants. The court, at that term, reversed the decree of the circuit court of Ohio, because a certain Abraham Garrison had not been made a party in that court; and the cause was remanded " with instructions to permit the complainants, the appellees, to amend their bill and to make proper parties, and to proceed *de novo* in the cause from the filing of such amended bill, as law and equity might require."

In the circuit court an amended bill was filed, making Abraham Garrison a party, and the parties proceeding to a final hearing, a decree was rendered in favour of the complainants, from which decree the defendants appealed to this court.

The case was argued by Mr Caswell for the appellant; and by Mr Ewing and Mr Clay for the appellee.

Mr Chief Justice MARSHALL delivered the opinion of the Court.

This suit was originally brought in the court of the United States for the seventh circuit and district of Ohio, sitting in chancery, by Thomas S. Hinde and Belinda his wife, for the conveyance of a lot of ground in the town of Cincinnati, designated in the plan of the town by the number 86.

The bill alleges that Abraham Garrison, under whom all parties claim, sold and conveyed the said lot of ground to William and Michael Jones, as is proved by his receipt in the following words. "Received, Cincinnati, 10th September 1790, of William and Michael Jones, fifty pounds thirteen shillings and three pence, in part, of a lot opposite Mr Coun's in Cincinnati, for two hundred and fifty dollars, which I will make them a warrantee deed for, on or before the 20th day, this instant.

"Signed, ABRAHAM GARRISON.

"Test, JACOB AWL."

That a deed was executed the succeeding day, which has been lost. That on the 26th of March 1800, William Jones, acting for and in the name of William and Michael Jones, conveyed the lot to Thomas Doyle, Jun. then an infant; and

[Vattier v. Hinde.]

that his father, Thomas Doyle, took possession of it in the name of his son, and retained possession until his death; that the said Thomas Doyle, Jun. having survived both his parents, died under age in the year 1811, leaving the plaintiff, Belinda, his sister by the mother's side, and heir at law.

The bill then alleges, that in the year 1814 the plaintiff, Thomas S. Hinde, in right of his wife, took possession of the said lot and placed a tenant on it; after which, in the year 1819, he obtained a deed of confirmation from William Jones.

The bill further charges, that James Findley, Charles Vattier, Robert Ritchie, William Lytle, George Ely and William Dennison, knowing the title of the plaintiffs, but discovering that the deed from Garrison to William and Michael Jones was lost, have procured a deed from Garrison to some one of them, and have turned his tenant out of possession The plaintiffs have commenced an ejectment against the tenants in possession, but are advised that they cannot support it. They therefore pray for a conveyance, for discovery and for general relief.

The receipt of Abraham Garrison to William and Michael Jones, and the deed of William, purporting to convey for Michael and himself, with the deed of confirmation executed by Michael, are filed as exhibits. The record also contains a deed of John C. Symmes, dated the 31st of July 1795, conveying the lot to Abraham Garrison. The deed from Jones to Doyle is in the name of William and Michael Jones, and is signed W. and M. Jones; but concludes, "in witness whereof the said William Jones hath hereunto set his hand and seal, the day and year first above mentioned."

James Findley answers, that having obtained a judgment for a large sum against Charles Vattier, the lot 86, with other real property to a large amount, was transferred to him in the year 1807 in satisfaction thereof, and possession of the lot was given. In the year 1815 he was informed that Abraham Garrison claimed the lot, and on searching the record, could find no conveyance from him for it. He purchased it from Garrison for the sum of seven hundred dollars, on condition of his conveying twenty-three feet, part thereof, to Abraham Garri-

son, Jun., the son of the vendor. Conveyances were executed in pursuance of this contract. Previous to this purchase, he understood that Thomas Doyle was once the owner of the lot, that it had been sold at a sheriff's sale as his property, and purchased by Charles Vattier. When he purchased, Garrison assured him that he had never sold the lot; and his inquiries among the old settlers respecting the sale to William and Michael Jones, were answered by assurances that they knew nothing more than report, that Thomas Doyle had claimed the lot, and that it was sold by the sheriff as his property. Never heard that the plaintiff, T. S. Hinde, had been in possession. In April 1818, on a compromise with Charles Vattier, he conveyed to him all his interest in the lot.

The deed from Findley to Vattier is made in consideration of one dollar, and a final settlement of all claims.

The answer of Charles Vattier states, that in the year 1800 the lot was advertised by the sheriff of Hamilton county to be sold under execution, issued on a judgment he obtained against Thomas Doyle, at which sale he became the purchaser, at the price of twenty dollars. Neither the return of the sale, nor the deed made to him by the sheriff can be found. He has no other knowledge of the title of Thomas Doyle, than that the lot was called his. He held possession under the sale, until James Findley became possessed thereof in 1807. In the year 1818 James Findley conveyed the lot to him for a valuable consideration, after which he conveyed to William Lytle.

The answer of William Lytle states that he purchased part of the lot 86 from Charles Vattier in 1818, for fifteen thousand four hundred dollars. He had no knowledge of the claim of Thomas Doyle, Jun. Some time before the purchase, he had heard that Mr Hinde had taken possession of some lots claimed by Thomas Doyle, deceased, but does not recollect which lots.

The answer of Robert Ritchie states, that he is a purchaser for a valuable consideration, without notice of that part of the lot No. 86, which was conveyed by James Findley to Abraham Garrison, Jun.

Sundry depositions were taken and exhibits filed, after which the cause came on to be heard, and the court decreed Charles

[Vattier v. Hinde.]

Vattier and Robert Ritchie severally to convey to the plaintiffs the parts they respectively held of the lot 86. From this decree the defendants appealed to this court.

On a hearing the decree was reversed, because Abraham Garrison was not made a party; and the cause was remanded to the circuit court with directions to permit the plaintiffs to amend their bill, and make Abraham Garrison a party, and to proceed de novo.

On the return of the cause to the circuit court, the death of the plaintiff, Belinda, being suggested, the suit was revived as to her heirs; and a bill of revivor, and an amended and supplemental bill was filed, making Abraham Garrison a party.

The bill, after reciting the matter of the original bill, and stating the death of Belinda Hinde without issue, whereby the plaintiff, T. S. Hinde, became entitled to a life estate, as tenant by the courtesy, and the other plaintiffs, who are infants, were entitled as the only issue and heirs of the said Belinda; prays that the suit and all the proceedings in it may stand revived and be prosecuted by the said Thomas, for himself, and for them as their next friend. The bill then charges, that James Bradford, Thomas Doyle and John Bradshaw were brother officers; that Bradshaw executed a voluntary bond to Thomas Doyle, the son of Thomas Doyle, binding himself to convey to him two hundred and fifty acres of land, part of a large tract, which is very valuable. This bond was delivered to Thomas Doyle, the father, for the benefit of his son, who afterwards sold the land to Samuel C. Vance for a large sum of money, which he received. To indemnify his son, he procured the lot No. 86 to be conveyed to him. This intention was declared at the time. He was then indebted, but not insolvent. Cincinnati then contained not more than one hundred inhabitants, and this transaction was generally known. After the execution of the bond to T. Doyle, the son, J. Bradshaw departed this life leaving a will in which he devised his whole estate to T. Doyle the elder. The estate of the father descended to his son, and on his death to his half sister Belinda, after which the plaintiff, T. S. Hinde, confirmed the sale to Vance.

After T. Doyle, the father, had taken possession of lot No.

Vol. VII.—2 H

86 for his son, sundry lots in Cincinnati were sold as his property under execution, some of which were purchased by Vattier; but lot 86 was not among them.

It remained open and unimproved until 1814, when the plaintiff, T. J. Hinde, took possession, and placed a tenant on it.

Vattier, erroneously supposing himself to have purchased this lot 86 among others, examined into the title, and must have become fully apprized of the title of T. Doyle the younger, as the deed from Jones to him was on record, and recites the deed from Garrison to Jones. In consequence of this, he took depositions in perpetuam rei memoriam, to prove that the consideration of the deed to the son moved from the father.

About the year 1807, Vattier, being largely indebted to Findley, transferred to him a large quantity of property, among which lot 86 was supposed to be included. It is understood that no money passed on this arrangement between Vattier and Findley, nor were the relations of the parties changed.

Findley examined into the title and became acquainted with its history from the recorder, T. Henderson. He determined to acquire the legal title from Garrison, which he did acquire at the price of seven hundred dollars, and the conveyance of twenty-three feet, part of the lot, to the son of the vendor. The lot was then worth thirty thousand dollars.

In 1818 Findley and Vattier readjusted their affairs, and lot No. 86, so far as Findley retained the title, was reconveyed to Vattier. He sold to Lytle for fifteen thousand dollars, who never paid any money; and the contract has been cancelled. The bill prays for a discovery and for a conveyance.

The answer of Abraham Garrison acknowledges the sale and conveyance to William and Michael Jones, and the receipt of the purchase money. He admits the receipt filed in the cause. He was induced to make the conveyance to Findley, by the assurance that the equitable title was already in him. He disclaims all title or interest, and prays to be dismissed.

The defendant, Garrison, having disclaimed all interest, and it appearing that he was a citizen of Illinois; and the defendants, who purchased the twenty-three feet of land, sold by Findley to Abraham Garrison, Jun., having filed their answers denying notice; and the plaintiffs admitting that notice could

not be fixed on them; the court, with the consent of the plaintiffs, decreed that the bill be dismissed as to them.

The answer of Charles Vattier states, the amendment of the bill, by which Garrison was made a party, and the subsequent dismission of the bill as to him; wherefore, he prays that the whole bill may be dismissed.

He does not admit that Belinda Bradford was the heir at law of James Bradford, or that she was born in lawful wedlock; nor does he admit the marriage of Thomas Doyle with the mother of the said Belinda, or the birth of T. Doyle, Jun.

He denies that the said Belinda was the heir of T. Doyle, Jun. He admits the conveyance of the lot from John Cleves Symmes in 1795 to A. Garrison, and that some contract was made by Garrison with W. and M. Jones, and that W. and M. Jones sold their equitable title to T. Doyle, who took possession in his own right, and not in right of his son. The consideration moved from the father; consequently, if the conveyance was made to the son, he held in trust for his father.

The deed from Jones was made, he says, to the son fraudulently, for the sole purpose of defrauding creditors. He denies that the father was indebted to the son. He denies that the lot lay open and unimproved. It was in possession of the defendant, who made some small improvements on it.

He obtained a judgment against the elder Doyle in February 1801, upon which an execution issued, which was levied on lot 86. An inquest summoned to ascertain the value of the premises, returned that Thomas Doyle was seised of lot No. 86, and that its clear yearly value was twelve dollars. A writ of venditioni exponas was issued, which was stayed by supersedeas; but the judgment was affirmed: after which the lot was sold under execution, and the defendant, Vattier, became the purchaser. There having been lots sold on the same day, the sheriff conveyed to Mr Barnet the lot sold to the defendant, and to the defendant the lot sold to Mr Barnet. The mistake was corrected by Mr Bennet, so far as his own interest was concerned, but was neglected by the defendant.

Some time after his purchase, he heard of the claim of young Doyle, and on being told by Jones that the purchase money

was paid by the father, he took depositions to perpetuate testimony.

He denies that Belinda, the late wife of T. S. Hinde, was the heir of T. Doyle, Jun.

He admits that upon a final settlement with Findley, the lot was reconveyed to him at the price of fifteen thousand dollars. He also admits the sale to Lytle, and a reconveyance of the property, the purchase money not having been paid.

The same defendant afterwards filed an amended answer, in which he states, that at the time of filing the original bill, Belinda Hinde, the plaintiff, whose right was asserted therein, had no title to the lot 86. That on the 5th day of October 1814, she, with her husband, Thomas S. Hinde, executed and delivered to Alexander Cummins, a deed of bargain and sale, whereby they conveyed the said lot to him in fee simple, which deed was recorded in the court of Hamilton county, a copy of which is exhibited with the answer.

In their replication the plaintiffs admit the execution of the deed set forth in the amended answer, but aver that if the deed was sufficient in law to transfer the estate of the said Belinda in the premises, which they do not admit, it was intended to vest the same in the said Alexander, in trust to reconvey the same to the said Thomas, to be held by him in trust for the use and benefit of the said Belinda and her heirs; and for this purpose the said Alexander did, on the 5th day of October 1814, reconvey the said lot to the said Thomas. And afterwards, in March 1815, did execute another deed for the same purposes, which last mentioned deed was properly recorded in Hamilton county.

The defendants rejoin to this replication.

On a hearing, the court dismissed the bill as to Lytle and Findley, they appearing to have no interest in the premises; and decreed that Charles Vattier do, within sixty days, release to the plaintiffs so much of lot 86 as was conveyed to him by James Findley. From this decree the defendant, Charles Vattier, appealed to this court.

The counsel for the appellant assigns several errors in the decree. The first is, that the court had no jurisdiction, the de-

fendant Garrison being a citizen of the state of Illinois. He contends that, in suits between citizens of the United States, all the parties on one side must be citizens of the state in which the suit is brought; and that the jurisdiction of the court depends on the state of parties at the institution of the suit. In support of this proposition he cites Nollan et al. v. Torrance, 9 Wheat. 537. In that case, a plea to the jurisdiction averred that the plaintiff and defendant *are* both citizens of the state of Mississippi. On demurrer this plea was held ill, because the jurisdiction of the court depended on the state of the parties at the institution of the suit, and not at the time of the plea pleaded.

The same objection was made, and the same case cited in support of it, in Connolly et al. v. Taylor et al., 2 Pet. 556. In that case the court said, "where there is no change of party, a jurisdiction depending on the condition of the party is governed by that condition as it was at the commencement of the suit." But this principle was not supposed to be applicable to a suit brought by or against several individuals, whose names were struck out during its progress. In the case of Connolly et al. v. Taylor et al. the plaintiffs were aliens and a citizen of Pennsylvania. The defendants were citizens of the state of Kentucky, in which the suit was brought, except one who was a citizen of Ohio. As between the citizen of Pennsylvania and of Ohio, the court, sitting in Kentucky, could exercise no jurisdiction. "Had the cause," said the court, "come on for a hearing in this state of parties, a decree could not have been made in it for the want of jurisdiction." The name of the citizen of the United States, who was originally a plaintiff, was, however, struck out before the cause came to a hearing, and the jurisdiction was sustained.

This case is, we think, in point. A decree between all the original parties could not have been made. Those plaintiffs who had a right to sue all the defendants, had in their bill united with themselves a person between whom and one of the defendants the court could not take jurisdiction. By striking out his name, the impediment was removed, and the jurisdiction between the other parties remained as it would have stood had his name never been inserted in the bill. The

court could perceive no objection founded in convenience or in law to this course.

It is impossible to draw a distinction, so far as respects jurisdiction, between striking out the name of a plaintiff and of a defendant. The citizen of Ohio may have been a more necessary party in the cause than the citizen of Pennsylvania. Had it been otherwise, the same principle which sustained the one alteration would have sustained the other.

In the case of Cameron v. M'Roberts, 3 Wheat. 591, John M'Roberts, a citizen of Kentucky, filed his bill in the court of the United States against Charles Cameron, a citizen of Virginia, and other defendants, without any designation of their citizenship. The defendants appeared and answered, and a decree was pronounced for the plaintiff. Upon a motion to set aside the decree, and to dismiss the suit for want of jurisdiction, the judges were divided in opinion on the following points, which was certified to this court.

" Had the district court jurisdiction of the cause as to the defendant Cameron and the other defendants? If not, had the court jurisdiction as to the defendant Cameron alone?"

The certificate of this court was, that if a joint interest vested in Cameron and the other defendants, the court had no jurisdiction over the cause. If a distinct interest vested in Cameron, so that substantial justice (so far as he was interested) could be done without affecting the other defendants, the jurisdiction of the court might be exercised as to him alone.

The other defendants were represented, on the motion, to be citizens of Kentucky; but this is of no importance, since the jurisdiction of the court was as much affected by the omission to aver that they were aliens or citizens of some other state, as it would have been by the averment that they were citizens of Kentucky.

This certificate applies to the state of parties at the time of the decree, and affirms this principle. If the defendants have distinct interests, so that substantial justice can be done by decreeing for or against one or more of them, over whom the court has jurisdiction, without affecting the interests of the others, its jurisdiction may be exercised as to them.

If then, when this cause came on for hearing, Abraham

[Vattier v. Hinde.]

Garrison had still been a defendant, a decree might then have been pronounced for or against the other defendants, and the bill have been dismissed as to him, if such decree could have been pronounced as to them without affecting his interests.

We perceive no principle of reason or law which opposes this course. The incapacity of the court to exercise jurisdiction over Garrison could not affect their jurisdiction over other defendants whose interests were not connected with his, and from whom he was separated by dismissing the bill as to him.

The second error assigned is attended with more difficulty. It is, that Abraham Garrison is a necessary party, without whom a decree ought not to be made. This objection derives additional force from the fact, that the former decree was reversed because he had not been made a party. Did the case now appear under precisely the same circumstances as at the former hearing, the same decree would undoubtedly be now pronounced. But it is insisted by the counsel for the appellees, that circumstances have so changed as to require a different decision. It did not appear in the record, as formerly brought up, that Garrison was not within the jurisdiction of the court. This circumstance is undoubtedly entitled to great consideration, and has always received it. It is the settled practice in the courts of the United States, if the case can be decided on its merits between those who are regularly before them, to decree as between them. Although other persons, not within their jurisdiction, may be collaterally or incidentally concerned, who must have been made parties had they been amenable to its process, this circumstance shall not expel other suitors who have a constitutional and legal right to submit their case to a court of the United States, provided the decree may be made without affecting those interests.

In the case of Osborn et al. v. The Bank of the United States, 9 Wheat. 738, this point was made and relied on by the appellants. A tax had been imposed by the legislature of Ohio on the Bank of the United States, which had been forcibly levied by the officer employed to collect it. A bill was filed against this officer, and against the auditor and treasurer of the state, praying that the money might be restored to the bank, the act imposing the tax being unconstitutional. The

process was served while the money was yet in the hands of the officer. The court decreed the restoration of the money, and the defendants appealed. The appellants insisted that the state of Ohio was the party really interested ; that the treasurer, auditor, and collecting officer were its agents ; and that no decree could be made unless the principal could be brought before the court.

This court admitted the direct interest of the state, and added, "had it been within the power of the bank to make it a party, perhaps no decree ought to have been pronounced in the cause until the state was before the court. But this was not in the power of the bank." The jurisdiction of the court was sustained, and the decree affirmed.

This is a stronger case than that under consideration. The money in contest would have been paid into the treasury of the state, had the bill been dismissed for want of proper parties. The decree arrested the money in its progress to the treasury, and restored it to the bank. All must admit that the state ought to have been made a party, had it been amenable to the process of the court. Yet this direct interest did not restrain the court from deciding the merits of the cause between the parties before it.

In the case at bar, Abraham Garrison has no claim, legal or equitable, to the property in contest. No decree could be made against him, and he has filed his answer disclaiming all interest in the cause. It is true that his answer is not evidence as an answer, since the court had no jurisdiction as to him. But in a question concerning himself only ; in a question whether the court will abstain from exercising its jurisdiction between parties, in some of whom the whole title in law and equity is vested, lest his interests should be affected ; his disclaimer of all interest, appearing in the form in which it appears, cannot be disregarded.

The rule that the court will proceed, although persons interested are not parties, if those persons are not within its jurisdiction, has been adopted also by the court of chancery in England. There, as here, the general rule is that "all persons materially interested in the subject ought to be parties, in order to prevent a multiplicity of suits, and that there may be a

complete decree between all parties having material interests; but this being a general rule, established for the convenient administration of justice, is subject to some exceptions, introduced from necessity, or with a view to practical convenience. "Thus," continues Mr Maddock (vol. 2, p. 142), "where persons interested are out of the jurisdiction of the court, and it is stated so in the bill and proved, it is not necessary to make them parties."

Had the case on the former hearing appeared as it now appears; had it been then known as it is now known, that making Garrison a party would turn the plaintiffs out of court, and that he disclaimed all interest in the cause; had these facts appeared in the former record; we think the decree would not have been reversed for the cause assigned for its reversal. We are therefore of opinion that the court committed no error in making their decree between the remaining parties, after the bill had been dismissed as to Abraham Garrison.

These preliminary objections being removed, we proceed to consider the rights of the parties.

A question has been made respecting the admissibility of great part of the testimony on which these rights depend.

Before the original decree was made, while the cause was depending in the circuit court, the parties, by their counsel, filed a consent in writing for the admission of all the testimony which had been taken in several suits which were depending between some of the same parties, relative to the same controversy, in all the suits both in law and equity. Under this agreement all the depositions were read without objection, at the hearing of the cause. When the decree then pronounced was reversed, and the cause remanded, the counsel for Vattier objected to such of the depositions as were not regularly taken; and now allege, in support of the objection, that the consent was no longer binding. That the order to proceed de novo was equivalent in effect to dismissing the bill without prejudice; and that new parties are brought into the cause.

The only really new party was Abraham Garrison, and the testimony was never used for or against him. The bill, as to him, was dismissed before the cause came to a hearing. The

[Vattier v. Hinde.]

new parties plaintiffs are the representatives of Belinda Hinde, an original plaintiff, and the proceedings are revived in their names by the order of the court on their bill of revivor. Under such circumstances, the settled practice is to use all the testimony which might have been used had no abatement occurred. The representatives take the place of those whom they represent, and the suit proceeds in its new form unaffected by the change of name.

The reversal of the original decree cannot annul the written consent of parties for the admission of testimony. That consent was not limited in its terms to the first hearing, but was co-extensive with the cause. The words in the decree of reversal, that the parties may proceed de novo, are not equivalent to a dismission of the bill without prejudice; nor could the court have understood them as affecting the testimony in the cause, or as setting aside the solemn agreement of the parties. The testimony, therefore, is still admissible to the extent of that agreement.

As the appellees claim under Thomas Doyle, Jun., the first inquiry is into the validity of his title.

It is derived, as is stated in the original bill, from Abraham Garrison, who sold to William and Michael Jones. This sale is proved by the receipt given for the purchase money, which receipt also contains a stipulation for a conveyance.

An objection is made to its admission in evidence, because it has not been proved by the subscribing witness. Some affidavits were filed, which state that after diligent inquiries at his former place of residence, no intelligence could be obtained respecting him, nor had he been heard of for many years. These affidavits are also objected to, because not regularly taken on notice.

The validity of this objection need not be examined, because the receipt is more than thirty years old, and is not only free from suspicion, but is supported by other testimony. In such a case the subscribing witness may be dispensed with. Bul. Nisi Prius, 255; 1 Starkie's Law of Evidence, 342. This paper vests an equitable title in William and Michael Jones. The bill alleges that a deed in pursuance of it was soon afterwards executed, and there is much reason to believe that the

[Vattier v. Hinde.]

allegation is true; but the deed is lost, and the proof of its existence is not thought sufficient to establish it.

In March 1800, a deed was executed by William Jones, for and on behalf of his partner Michael and himself, conveying the lot 86 to Thomas Doyle, Jun.

The appellants insist that this deed is fraudulent; that the consideration moved from Thomas Doyle the father; and that the conveyance was made at his instance to his son, then an infant, for the purpose of protecting the property from the creditors of the father, who was then insolvent.

The appellees insist that the money paid, was in truth the money of the son then in the hands of the father, and that the transaction was a fair one. They admit that Thomas Doyle, Sen. was indebted, but not insolvent. The bill states that the money of the son came to the hands of his father, in the following manner.

John Bradshaw, the intimate friend and brother officer of Thomas Doyle, being an old bachelor without near relations, executed a voluntary bond to the son of his friend, for two hundred and fifty acres of valuable land, part of a larger tract, which he deposited with the father for the use of the son. This statement is corroborated by the will of Bradshaw, in which he gives the residue of the land, and all his other property to Thomas Doyle. What is denominated a bond, is in substance a deed poll. It describes the tract of land, of which the two hundred and fifty acres it purports to convey are a part; and then, for a valuable consideration, bargains and sells the said two hundred and fifty acres to Thomas Doyle, Jun. son of major Thomas Doyle, a major in the service of the United States. This bond or deed is attested by two witnesses, and bears date the 7th day of January 1794. The handwriting of one of the subscribing witnesses who is dead, is proved; and a witness testifies that he has heard nothing concerning the other, though he has made inquiry for him. The hand writing of Bradshaw is also proved.

On the 17th of May 1796, Thomas Doyle, the father, made the following assignment of this instrument. "In consideration of four hundred dollars to me in hand paid, I sign over in behalf of my son, Thomas Doyle, Jun., my right and title to the within

mentioned tract of land, and obligate myself in the penalty of six hundred dollars, that when he becomes of sufficient age, that he will sign over his right and title of the same, agreeable to law." Signed, Thomas Doyle. The payment of the consideration money specified in the assignment is proved.

Thomas Doyle, then, was, in May 1796, indebted to his son for money received to his use, in the sum of four hundred dollars. Although the son might, when of age, have refused to receive this money, and have asserted his title to the two hundred and fifty acres, had the tract of which it was a part, remained the property of his father the devisee of Bradshaw, or of a purchaser with notice, yet he was not compellable to assert it; and, his title not being on record, he could not have asserted it against a purchaser without notice. Thomas Doyle the son then was a bona fide creditor of his father, for the sum of four hundred dollars. The circumstances under which this debt was created, or the relationship between the parties, cannot render it less sacred.

In March 1800, Thomas Doyle, being thus indebted to his son, directed the conveyance of lot No. 86, to be made to him, declaring at the time, that it was made in consideration of the debt he owed for his son's land sold to Vance. Had this transaction been in favour of any other creditor than a son, its fairness could never have been impeached. Had he, as guardian for any other person, secured a debt under the same circumstances, the helpless infancy of the ward would not have tainted the transaction with fraud. The connexion between the parties may excite suspicion, may justify a more scrutinizing investigation of all the circumstances; but if the result of this investigation be, as we think it is, that the conveyance was in payment of a debt of the most sacred obligation, a debt which a conscientious debtor ought to have paid, it is valid in law. The consideration mentioned in the deed, is three hundred and fifty dollars, and it is not suggested that the lot was worth more than that sum.

This deed could pass only the interest of William Jones. But it purported to convey the interest of both partners. The presumption arising from the language of the deed and the connexion between the parties, that the land was considered as

[Vattier v. Hinde.]

an article of merchandize, and supposed to be conveyed as such an article, is strengthened, if not confirmed by the deed of confirmation afterwards made by Michael Jones, the other partner and joint owner of the lot, and by his deposition which states that the purchase was made by William, the acting partner, who directed the conveyance to be made to the firm.

This being the title of Thomas Doyle, Jun., we are next to inquire whether it has descended on Belinda, the plaintiff in the original suit, and his sister on the part of the mother.

The plaintiffs make two objections to her title.

1st. That she was not born in lawful wedlock, and was therefore incapable of taking lands by descent.

2d. That if legitimate, she could not inherit this from her half brother; because she is not of the blood of the first purchaser.

1. Belinda was the daughter of James and Margaret Bradford. Several witnesses testify that they lived together as man and wife, acknowledged each other in that character, and were reputed to be lawfully married. The will made by Mr Bradford, after being mortally wounded, bequeathes one half of his estate to his wife, Margaret Bradford, "now pregnant;" and the other half to his child "of which" she was then pregnant.

To this testimony the appellant opposes some rumours that they were married by a military officer, a person not authorized to perform the ceremony.

We cannot hesitate on this question. Belinda Bradford, the child mentioned in the will of her father, must unquestionably be considered as legitimate.

2. It is alleged that she could not inherit this lot, unless Thomas Doyle, Jun. died before the enactment of a law which limited the inheritable capacity of the half blood to the blood of the first purchaser; and the appellants insist that this fact is not proved.

The court has not inquired into it, because Thomas Doyle, Jun. is himself the first purchaser, and may transmit the lot to his half sister, whether on the part of the father or mother. The plaintiff Belinda then succeeds to all the rights of Thomas Doyle, Jun. in the lot in controversy.

We are next to inquire how those rights are affected by the title of the appellants.

Charles Vattier, the appellant, claims under a sale made in 1802, by the sheriff of Hamilton county, by virtue of an execution issued on a judgment obtained against Thomas Doyle, which he says was levied on lot No. 86. At this sale he alleges that he was the highest bidder, and, as such, became the purchaser. The sheriff made the deed on the 14th of July 1828. The consideration expressed is ninety dollars.

The appellees do not admit the fact that this lot was really sold as the property of Thomas Doyle. The testimony, which would seem to be conclusive, that this lot was sold as alleged by Vattier, is repelled by circumstances of great weight. But, admitting this fact to be completely established, its influence in the cause is countervailed by the circumstance that Thomas Doyle had no semblance of title in law or equity to the lot on which the execution was levied. The deed of William Jones, in the name of William and Michael Jones, conveying the lot to Thomas Doyle, Jun., was recorded in March 1800. If persons were not bound to notice this deed because the title of Jones did not appear on the record, still there was no trace of title from any person whatever to Thomas Doyle. This sale, then, was totally unauthorized, and could convey nothing. No title being in Vattier, he could convey none to Findley. If then, at any time before the deed from Garrison to Findley, a controversy had arisen respecting the title to this lot between the heirs of Thomas Doyle, Jun. and Charles Vattier or his vendee, each claiming a conveyance of the legal title, the decision must have been in favour of Doyle's heirs. They had, if not the legal right, a complete equitable title, to which no single objection could be made.

Was the conveyance from Garrison to Findley made under circumstances which ought to defeat this title?

Charles Vattier having become largely indebted to James Findley, this lot with other property is said to have been transferred to him in 1807, in part satisfaction of the debt. The conveyance, if any was made, is not adduced; nor have we any satisfactory evidence, if one was made, that it included this lot. It is not pretended that any money was paid in con-

sequence of this arrangement. Some considerable time after it, Findley, having become fully apprized of the defect in his title, and of the conveyance to Thomas Doyle, Jun., applied to Garrison, and, in 1815, obtained a conveyance from him. He afterwards conveyed this property to Vattier. If Vattier can now be deemed a purchaser without notice, his title cannot be disturbed.

It is not alleged that either Vattier or Findley was without knowledge of the rights of the appellees when the legal title was acquired. It is contended that they acquired the property and paid the purchase money without this knowledge, and might therefore conscientiously protect themselves by getting in the legal estate.

Let this allegation be examined.

In 1802 Vattier purchased the title of Thomas Doyle, the elder, who had no title whatever. Whether he knew that a conveyance had been made to Thomas Doyle, the younger, or not, is immaterial. He could acquire nothing. The principle *caveat emptor* is completely applicable.

The rules respecting a purchaser without notice are framed for the protection of him who purchases a legal estate and pays the purchase money without knowledge of an outstanding equity. They do not protect a person who acquires no semblance of title. They apply fully only to the purchaser of the legal estate. Even the purchaser of an equity is bound to take notice of any prior equity. Vattier's original purchase, then, cannot avail him, because he was bound to notice the equity of Doyle. But there is, we think, much reason to believe that he had actual notice of that equity; or, at any rate, was informed of circumstances which ought to have led to such inquiry as would have obtained full notice.

The title of Garrison, under whom Doyle was supposed to claim, is presumed by the law to have been known to Vattier. He ought to have inquired into it. In his answer, he says, "he has been informed and believes that some kind of a contract was made by the said Abraham Garrison with William and Michael Jones for the sale to them of the lot aforesaid." He does not state the time when this information was obtained, nor is there any reason to believe that it was subseque t to his

purchase. He also admits his information and belief that W. and M. Jones sold their right to Thomas Doyle the elder, who paid them the full consideration for the same, and took in his own right, and in the right of his son. He does not say when this information was obtained. He says he had no other knowledge of the title of Thomas Doyle to the lot than its being called his, and being sold as his. These circumstances lead to the opinion that this information was received anterior to his purchase.

In so small a society as was then settled in Cincinnati, it is not probable that the title of Thomas Doyle the son, which was of record, should have been unknown. It would, most probably, be the subject of conversation. But be this as it may, a purchaser was bound to make inquiries from Garrison. Had the lot been sold as the property of Garrison, full notice of the equity of Jones and of Doyle would be required to defeat the rights of the purchaser; but, being sold as the property of Thomas Doyle, Sen., the purchaser was bound to inquire into his title. In making these inquiries, Vattier, if he then possessed a knowledge of the sale to Jones; and if he did not, he ought to have been more explicit in his answer; should have searched for a conveyance from Jones to Doyle. He must have found one from Jones to Thomas Doyle, Jun. Under these circumstances, Vattier ought to have taken notice of the prior equity of Doyle. If he did not, he is chargeable with negligence.

But it has been argued, that Findley purchased what he supposed to be a legal title, and might protect himself after discovering his mistake.

Several answers have been given to this argument.

The lot was understood to have been sold as the property of Thomas Doyle, Sen., and the sheriff's deed to Vattier stated it to be sold as the property of John C. Symmes, under an execution against him. Symmes had no title. If it was actually sold as the property of T. Doyle, Sen., he could show no semblance of title. James Findley, therefore, was bound to know that he received from Vattier a property to which the vendor had no other right than was given by possession. He was, consequently, bound to take notice of all existing equities, and

could not maintain his possession against them. Had he been about to make a purchase, he must have examined the title of Vattier, and must have discovered that he had none. Upon such examination, the deed from Jones could scarcely have escaped his notice.

Findley had paid no money for the lot. The character of the transaction between Vattier and himself is not explained. A new arrangement of all their affairs appears to have taken place, by which this lot was returned. Previous to this new arrangement, he had full notice of the title of the appellees, and with this notice purchased from Garrison at a great under-value. It is not alleged, nor can we presume that he was driven to this purchase as the only refuge to protect himself from loss. Had such an allegation been made, it would require an examination of the contract and transactions between himself and Vattier; but it is not made.

Upon a full consideration of all the circumstances under which Findley bought from Garrison, we cannot consider him as entitled to that protection which a court of equity affords to a man who purchases a legal title and pays the purchase money, without notice of an equity existing against the property which had been sold to him. At the time of acquiring the legal title, he had full notice of the equity of the appellees; and we do not think he has shown himself to have been placed in a situation which would justify his procuring a conveyance from Garrison. If he was not himself protected against the equity of Doyle's representatives, he could communicate no protection to Vattier, who had himself full notice.

The conveyance to Lytle, and the reconveyance from him, cannot affect the case, because no money was paid.

If, then, the case of the appellees had been correctly stated in their bill, we should have thought them entitled to the relief for which they prayed. But it was not correctly stated. The bill sets forth a title in Belinda, the wife of Thomas S. Hinde, by direct descent from her brother to herself, and insists on this title.

The answer resists the claim because the land had been conveyed by the plaintiffs, before the institution of their suit,

to Alexander Cummings. The plaintiffs, in their replication, admit the execution of the deed to Cummings, but aver that it was made in trust to reconvey the same rights to the said Thomas, to be held by him in trust for the use and benefit of the said Belinda and her heirs, and to enable the said Thomas the more conveniently to manage, litigate and protect the said rights; and that the said Alexander Cummings did afterwards, in execution of the said trust, make a deed to the said Thomas, which is recorded in the proper county. The deed referred to is exhibited, but expresses no trust for the wife and her heirs.

Will the rules of the court of chancery permit this departure in the replication from the statements of the bill?

It is well settled that a decree must conform to the allegations of the party, as well as to his proofs. The answer, supported as it is by the deed to Cummings, would have put the plaintiffs out of court, had they not made a new case in their replication. Ought not this case to have been made in their bill, and can the omission to make it be supplied by averments in the replication?

The act for regulating processes in the courts of the United States, vol. 2, p. 299, enacts, that "the forms and modes of proceedings" in courts of equity and in those of admiralty and maritime jurisdiction, shall be "according to the principles, rules and usages which belong to courts of equity and to courts of admiralty respectively, as contradistinguished from courts of common law;" subject, however, to such alterations, &c.

This act has been generally understood to adopt the principles, rules and usages of the court of chancery of England. By the principles, rules and usages of that court, the plaintiffs, in such a case as this, must have amended their bill. 2 Mad. Ch. 275, 286; Mitf. Pl. 256. They could not have been permitted to make a new case in their replication.

The act permits this court to prescribe rules for the practice of the circuit courts. Rules have been prescribed in pursuance of this power, but they allow a special replication to be filed only with leave of the court. This replication was filed without leave, and is consequently not saved by the rule. We think it obviously proper that the real case should have been stated in the bill, and that the decree ought not to have been

[Vattier v. Hinde.]

pronounced in the actual state of the pleadings. For this fault we are of opinion that the decree ought to be reversed, and the cause remanded, with directions to permit the plaintiffs to amend their bill.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of Ohio, and was argued by counsel: on consideration whereof, this court is of opinion, that to entitle themselves to the decree which was pronounced in their favour, the plaintiffs in the circuit court ought to have stated their case truly in their bill as it now appears on the record, and that after the amended answer was filed, showing the deed from Thomas S. Hinde and Belinda his wife to Alexander Cummings, the plaintiffs ought to have obtained leave to amend their bill, so as to introduce into it the reconveyance from Alexander Cummings to Thomas S. Hinde, on the trusts agreed on between the parties, instead of alleging this new matter in their replication. This court is further of opinion that the circuit court ought not to have pronounced its decree, and that for this cause the decree ought to be reversed, and is hereby reversed, so far as it directs a conveyance to be made by the appellant, Charles Vattier, and the cause is remanded to the circuit court, with directions to permit the plaintiffs to amend their bill.