[Philadelphia, May 1st, 1841.]

## QUINN *against* WALLACE and Another.

### IN ERROR.

1. In replevin by a sub-lessee, for goods taken by the paramount landlord, on a distress for rent, on the plea of no rent in arrear, a receipt for rent given by the immediate lessee to the plaintiff, is not admissible on the part of the plaintiff.

2. In replevin by a sub-lessee for goods taken by the paramount landlord, on a *distress* for rent, on the plea of no rent in arrear, where it appears that the defendant had previously distrained the goods of the mesne tenant for rent arrere, and sold the same, it lies upon the defendant to show that the distress first taken was insufficient.

3. It seems that the act of 13th of March, 1772, which says that the landlord *shall* or *may* sell the goods distrained, is imperative, and makes it the duty of the landlord to sell.

Error to the District Court for the City and County of Philadelphia.

An action of replevin was brought in that court by William Quinn against Richard Willing and William Wallace, to which Willing avowed for rent in arrear, and Wallace made cognizance as his bailiff. Replication, no rent in arrear.

On the trial before STROUD, J., the plaintiff gave in evidence the following notice of the taking of the goods:

"Richard Willing           Landlord's warrant.
        v.
Samuel Collins.        Rent due Jan'y 1, 1835.   $1125.

Levy made Jan'y 8, 1835.
(Here follows an inventory of the goods distrained.)
This is made in addition to a levy made' Jan'y 2, 1835, not being sufficient.

WM. WALLACE,
Agent for R. Willing."

The plaintiff then called one David Hazard, who, being affirmed, testified that Mr. Willing, the defendant, came to the plaintiff's shop for rent in January, 1816, and wanted Quinn to pay his rent up to that time to him, and in future to pay his rent to Saunders, to whom Willing had leased the premises. Quinn paid up the rent accordingly to Willing, and afterwards paid his rent to Saunders as long as he continued; then he paid to Lelar, who succeeded Saunders; and afterwards to Samuel Collins, who succeeded Lelar. On the 7th or 8th of January, 1835, Mr. Wallace made a levy on Quinn's goods for rent due Willing of $1125. Two or three days before this seizure, Quinn told Wallace he had paid his rent to Samuel Collins. Wallace told him not to pay his rent to Collins; and he told him he had paid it to him.

The plaintiff having first proved the same, now offered in evidence a receipt of Samuel Collins, dated January 1, 1835, to William Quinn, for $137 50, in full of his (Quinn's) rent, up to the 1st January, 1835; which was objected to by the defendants, and rejected by the court: whereupon, the plaintiff excepted to its rejection.

The plaintiff then called Michael Carlin, who testified as follows: " I know the plaintiff and Samuel Collins. I lived next door in the same property. In 1835, on the 2nd of January, Wallace came down and seized on the sand in two stores, and the wood on the wharf. There was considerable cordage up-stairs, and a large quantity of boats' oars also; all on Samuel Collins's premises. Wallace placed Mr. Bain there as a watchman; and he had charge of the counting-house of Collins. I saw Wallace there two or three times a day. Bain said he was put in charge of the wood and sand. Can't say whether he had charge of the oars and cordage up-stairs. Six or

seven days after this, Wallace came to my store, and said he was going to levy. The sand levied on was sold by Wallace by the load. There were 200 cords of wood on the wharf and 80 cords in the alley; hickory, oak and pine: hickory was selling at $6 50 to $7 per cord; oak was worth $5 to $5 50; pine $4. It was a good time to sell; wood was high. In the alley, the pine was greatest in quantity; two thirds of that on the wharf was oak; other third was hickory and pine. I rented of Quinn a back room. There were 9 or 10 properties belonging to Mr. Willing; he rented all to Samuel Collins." Cross-examined. "I was in my store when Wallace came to make the first seizure; next to Collins's. I did not see any paper relative to that seizure; I don't know to whom the wood belonged: some of it belonged to Collins, I know; I know that part of it was sold as Collins's wood, at auction; 15 or 20 cords of hickory were so sold. The sand in the store I saw sold; there was a large quantity of it; it was all sold in lots to different purchasers; the hickory and sand were sold by Wallace. Collins was in the habit of having wood on commission. The sand was all Collins's; I was present at the sale of the sand and wood; a carter by name of Helty bought a large quantity; John Hanson and James Marks bought some sand, and several others. I understood that a claim was made at the sale, by some persons, that some of the wood was their's; can't say who, or how many, or for how much."

William Paul, testified.—" I occupied part of the property rented of Collins. Wallace seized for rent; he seized Collins's sand; there were two rooms full of building sand; I think 1000 cart loads. There were also oars, a very large quantity; ship's cordage, and several bundles of it; these all belonged to Collins; it was all understood to be his before it was seized on; it was all in Collins's shop and the apartments occupied by him. There was wood on the wharf also. The sand was worth fifty cents per cart load, without hauling; I have bought it myself. There might have been 100 pair of oars." Cross-examined. " I heard Wallace say he had seized on the sand; Collins was present then. I know the oars were seized on by Wallace; I heard him say so, and I saw the sheriff's watchman throwing them out of the window for the sale. Collins said this sand was his; and Daniel J. Thomas, his clerk, also said so: he bought it for speculation."

William Quinn, a son of the plaintiff, testified.—" I lived with Collins; was his apprentice. I was not there at the time of the seizure. Wallace seized on the sand and wood; the wood belonged to different persons, principally in Jersey; part of the wood was Collins's; I don't know how much; can't say how much was seized on; three rooms full of sand, ten feet high; they would hold as much as this room. Sand is generally about 50 cents per load without hauling—retail price. There were 20 or 30 coils of cordage not seized on."

(Quinn *v*. Wallace.)

Cross-examined. "The oars and cordage I think were not seized on; I helped to remove them under Collins's direction; removed all. I was not present at the sale; the room was filled with sand; don't know to whom it belonged; about 12 feet wide; it all belonged to Collins."

The plaintiff here closed his case.

The defendant then produced Henry Lelar, junior, a witness who testified as follows: "I was agent of Willing, to collect rent of this property and receive possession. I called on Collins on the 1st of January, 1835, for a quarter's rent, and requested payment of the amount, and possession of the property; he refused payment. I authorised the constable to make a distress, and received from Wallace the proceeds of sale, $88 and some cents; that is all that was received; this is the paper Wallace presented to me in settlement. Last I heard of him he was in Ohio; I have made inquiries of him."

The counsel for the plaintiff then requested the court to charge the jury upon the following points, viz.—

"1st. If the jury believe that a distress was made on goods in possession of Collins, before a second distress could be made, it was for the defendant to show what disposition was made of the first."

To which the judge answered, "This is not so. The mere levy of a distress is not satisfaction of the rent; and the mere proof that a distress had been made, without more, would not preclude the landlord from making another distress. It was for the plaintiff to show that the rent was due when his goods were distrained; and if he wished to use the first distress as proof of payment, it was incumbent on him, and not on the landlord, to show what was done with it."

"2nd. If the jury believe that a distress was made upon goods in possession of Collins, a second distress on Quinn's goods was illegal, unless the first was insufficient."

Answer.—"A distress levied is not satisfaction; and until the landlord has received satisfaction, he has a right to distrain any goods found on the demised property. He had a right therefore to distrain Quinn's goods unless all his rent had been paid."

"3d. That the defendant's rent was satisfied by making a first distress until the disposition of it was shown by defendant's answer."

Answer.—"I have already said that the mere levy of a distress is not satisfaction, and that it does not stand in the way of the landlord in making a second distress; that it was on the plaintiff and not the defendant in the issue joined, to show that the rent was paid, and of course the plaintiff was bound to show that the goods first distrained had been converted into money and were sufficient to

pay the whole rent. If any thing whatever were due, under this issue, your verdict should be for the defendant. According to the paper given in evidence by the plaintiff, it would seem not that there were two distinct distresses, but rather that an addition was made of Quinn's goods to those of Collins then in the hands of Wallace. Such a continuous levy might be lawfully made. See *Hutchings* v. *Chambers,* (1 *Burrow's Reports,* 589.)"

The jury found for the defendant; who took this writ of error.

The following errors were assigned:

" 1. Because the judge erred in rejecting the receipt of S. Collins to the plaintiff for rent up to the first of January, 1835.

2. Because the judge erred in charging that even if a distress was made upon goods in possession of Collins, the burthen of proof was not on the defendant to show what disposition was made of the first, before a second distress could be made.

3. Because the judge erred in his answers to the second and third points of the plaintiff as propounded to him."

Mr. *I. Norris* and Mr. *D. P. Brown,* for the plaintiffs in error, cited 1 *Saund. Rep.* 201 (a). *Cro. Eliz.* 13. 2 *Lutw.* 649. *Comyn's Land. and T.* 414. *Woodfall,* 334. *Bradby on Distresses,* 415. *Hutchins* v. *Chambers,* (1 *Burr.* 589.) *Act of March,* 1772. 2 *Saund. Rep.* 47. *Watson on Sheriff,* 191; *Clark* v. *Withers,* (6 *Mod.* 290; S. C. 2 *Ld. Raym.* 1072.) *Cro. Jac.* 514. *Co. Litt.* 272. *F. N. B.* tit. Recaption.

Mr. *Emlen* and Mr. *Williams,* for the defendant in error, cited 2 *Saund. on Plead. and Evid.* 168. *Hill* v. *Miller,* (5 *Sergeant & Rawle,* 355.) *Smith* v. *Aurand,* (10 *Serg. & Rawle,* 92.) *Lear* v. *Edmonds,* (1 *Barn. & Ald.* 157.) *Lingham* v. *Warren,* (2 *Brod. & Bingh.* 36; 6 *Eng. Com. Law Rep.* 10.) *Hudd* v. *Ravener,* (2 *Brod. & Bingh.* 662; 6 *Eng. Com. Law Rep.* 306.) 2 *Chitty's Prec.* 708, *note.*

KENNEDY, J., delivered the opinion of the court.

The first error is an exception to the opinion of the court, rejecting the receipt proved to have been given and signed by Samuel Collins for rent, thereby acknowledged to have been paid to him up to the first of January, 1835. Had the receipt been given by R. Willing, the lessor of Collins, or had evidence been given, showing that Collins was authorised by Willing to receive the rent for him, the receipt would have been admissible evidence. But without this it does not appear to have been admissible in this action as against Willing or Wallace his bailiff, even to prove the fact that the amount of the money mentioned in it was paid by the plaintiff to Collins;

(Quinn v. Wallace.)

because for aught that appeared, the receipt might have been given by Collins without his having received the money mentioned therein, or any part of it.   It might have been a contrivance between the plaintiff and Collins to defraud Willing.   The fact of the money having been paid was susceptible of better evidence; for Collins, if no other, knew it, and not being a party to the suit, might have been called as a witness to prove it.   Evidence of his bare declaration that he had paid it, could not have been received to prove it was so in this case; because it would only have been hearsay; and his acknowledgment, though in writing, that he had received it, is of the same character and no better.   Neither am I inclined to think that the evidence of Collins or any other, if objected to, could have been received under the plea in this case, to prove the fact, that the amount of the rent mentioned in the receipt was paid by the plaintiff to Quinn.   The plea, it must be observed, is, no rent in arrear. Now the fact of the plaintiff having paid rent to Collins, without any authority from Willing to Collins to receive it for him; or agreement on the part of Willing not to distrain the goods of the plaintiff for rent that should become due upon the lease from Willing to Collins, if the plaintiff paid to Collins the rent as it became payable according to the agreement between them, could not exinguish or lessen the rent falling due to Willing under his lease to Collins, which is the rent claimed here; or tend in the least to show that none was due thereon by the latter.   If however the plaintiff had pleaded to the cognisance of Wallace, as bailiff of Willing, that he had made a former distress on the goods of Collins of sufficient value to satisfy the rent claimed, I am not satisfied that it would not have been admissible evidence, in connection with what was testified to by David Hazard, that the plaintiff some two or three days previous to the distress being taken in this case, told Wallace that he had paid his rent to Collins.   It might possibly therefore have been considered an equitable circumstance in favour of the plaintiff, which would have gone to discharge his goods from being distrained on for the rent in question, after goods of sufficient value belonging to Collins to satisfy it had been distrained on.   On this point, however, I do not wish to be understood as giving any settled opinion, because it will appear in the sequel that such a plea, if established by proof, would be a bar to the second distress, without the aid of such a circumstance.

Then in regard to the three remaining errors, they may be reduced into two questions; first, is it lawful for the landlord, after having distrained the goods of his immediate lessee for the amount of rent due to him, to distrain again the goods of a sub-lessee on account of the same rent, without showing any cause for the second distress?   And secondly, if the second distress be taken, especially after the time allowed by law for replevying the first, and it appears that a sale of the first was made under the act of assem-

bly, at the instance of the landlord, upon whom does the burthen lie of proving the sufficiency or insufficiency of the first distress; does it rest upon the landlord or sub-tenant?

As to the first question, Mr. Comyn in his treatise on the law of Landlord and Tenant, 414, (6 *Law Lib.* 233,) lays it down, that by the common law, if there were sufficient property upon the premises, and the landlord neglected to take sufficient distress, he could not again resort to the tenant's property to make up any deficiency in the first distress. For this position, he cites *Anon.* (*Moo.* 7;) *Anon.* (*Cro. Eliz.* 13;) *Wallis* v. *Savill,* (*Lutw.* 1536,) which go fully to sustain it. And much less, I apprehend, would he have been permitted to resort to the property of a sub-tenant for a second distress, especially where the sub-tenant had paid up for the same time, all the rent coming from him to his immediate lessor. That the common law in England was so, is also corroborated and confirmed by the statute of 17 Car. 2, c. 7, s. 4, which enacts, that where the value of the cattle distrained shall not be found to be of the full value of the arrears distrained for, the party to whom such arrears are due, his executors or administrators, may distrain again for the said arrears. It is clear, therefore, from this provision in favour of the landlord, that if he had not been restrained by the common law from making a second distress in such case, there would have been no occasion for making any statutory provision of the kind. This statute, however, has never been in force in this state by adoption or otherwise; and hence we have only the rule of the common law in this respect, for our guide. It is true, however, that Lord MANSFIELD, in *Hutchins* v. *Chambers,* (1 *Burr.* 589,) seems to lay great stress upon the circumstance in the case of *Wallis* v. *Savill,* that the rent due was an *entire* sum, and that the first distress was made only for a part of it, and the second for the residue; upon which he observes, that a man who has an *entire* duty, shall *not split* the *entire* sum; and distrain for *part of it* at one time, and for *other part* of it at another time; and so *toties quoties,* for several times; for *that* is great oppression. But it would rather appear from the report of *Wallis* v. *Savill,* as also from the report given of the other two cases, that the reason which determined the court in holding the second distress to be illegal was, because it was the folly of the landlord not to take a sufficient distress in the first instance, if property sufficient for that purpose was to be found on the premises; so that he should not come a second time to disturb the tenant in his possession. And indeed from the cases, as reported in Moore and Croke, it would seem that each of the two distresses was made for the same *entire sum* of rent, so that splitting of it into parts could not have been made the ground of the judgment of the court. But admitting the reason assigned by Lord MANSFIELD, and the conclusion that he came to on the subject to be correct, still it was incumbent upon the landlord, or his bailiff, on the trial of this cause, to have shown some good reason for making the second distress, other-

wise the court ought to have instructed the jury that it was illegal. This is clearly deducible even from what Lord Mansfield has said in *Hutchins* v. *Chambers,* when he says, " if a man seizes for the whole-sum that is due to him, and only mistakes the value of the goods seised, (which may be of very uncertain or even imaginary value, as pictures, jewels, race horses, &c.,) there is no reason why he should not afterwards complete his execution, by making a further seizure ;" thus plainly implying, that without such mistake, there would be reason why he should not afterwards complete the execution, by making a further seizure. And accordingly Serjeant Williams, (1 *Saund.* 201 a,) after referring to 1 *Burr.* 589, says, if the landlord distrains a second time for the same thing, he ought to· show that at the time of taking the first distress, there was not sufficient on the premises, or that he had mistaken· the value, and that the first was only of such a value, otherwise the second distress will be bad. Not only great embarrassment and confusion, but frequently a misconception of the law, arises from not attending more strictly to the rules of pleading in our practice than we do. Now in order to show more clearly that it was not only the duty of the landlord in this case to have alleged his reason for making the second distress, but likewise to have established it by sufficient proof, let us suppose that the plaintiff had pleaded the first distress in bar of the second, as in strictness perhaps he ought to have done ; it is clear that his plea would have required a replication from the defendant ; and what, let me ask, should that replication have been, according to Lord Mansfield's suggestion and reasoning on the subject ? Clearly, that the defendant was mistaken·in the value of the property first distrained ; or what would have been still more powerful as an excuse, if the fact were so, that sufficient property to satisfy the amount of the rent was not to be found on the premises at the time of making the first distress. The allegation then, thus made by the defendant in his replication, being material to his defence, would necessarily have required proof on his part, showing that it was true, otherwise he would have failed to make out his justification for taking the second distress, and consequently a verdict would have been found against him. And so it is said in *Wallis* v. *Savill,* (*Nelson's Lutw.* 493,) that the landlord cannot take two distresses for one and the same rent, but ought to distrain as many cattle at one time as may satisfy the whole rent; and if there be not enough, then he should plead that at the time of the first distress made, there were not cattle enough on the land, &c., and that it was made for so much, &c. But the District Court instructed the jury in this case, that the first distress taken was not a satisfaction of the rent; and until the landlord had received satisfaction, he had a right to distrain any goods found on the demised property. He (meaning the defendant) had a right therefore to distrain the plaintiff's goods, unless all his rent had been paid; and that it was on

the plaintiff, and not on the defendant, in the issue joined, to show that the rent was paid; and of course the plaintiff was bound to show that the goods first distrained had been converted into money, and were sufficient to pay the whole rent. Thus, in substance, directing the jury, that the defendant had a right to distrain any goods found on the demised premises from time to time, and as often as he pleased, for the same entire sum of rent, without alleging or showing any reason or excuse for so doing, notwithstanding there was property enough on the premises, at the time of taking the first distress, to have satisfied the whole of the rent. It is true that the court, in this direction, have used the words " in the issue joined;" and if the court intended thereby to qualify it, still we think it was out of season to add any qualification of the sort; for the plaintiff had been permitted, without objection, to give all his evidence showing the first distress, the same as if he had pleaded it in bar to the second distress, which was made on his property. It does not appear, that he offered or attempted to show by evidence that sufficient money had been raised, by a sale of the first distress, to pay the whole of the rent distrained for, so as to entitle him strictly, perhaps, in the opinion of the court, to have given the second distress in evidence under the issue joined on the plea of no rent in arrear. On the contrary, it would appear that he contented himself with showing a prior distress made on the property of the immediate lessee of the landlord, of sufficient value to have satisfied the whole of the rent claimed. Now if this had been objected to, because not properly admissible under his plea, he might thereupon have moved the court for leave to amend by adding the plea of a former distress for the same rent, which would have been granted as a matter of course. It would therefore be wrong to deprive him of the benefit of his evidence, after it had been given to the jury without objection; and when, if objection had been made, he could have entitled himself to have given and have had the full benefit of it. But in the discussion of the second question and the answer that will be given to it, it will be shown, that the evidence last mentioned was admissible under the plea of no rent in arrear, as *prima facie* evidence of the rent being satisfied; and if believed by the jury, ought to have been so considered in law by them, unless evidence had been given on the part of the defendant repelling or disproving it. So that the District Court, in our opinion, erred in their direction to the jury, under any view that can be taken of it.

We come now to the second question. In examining this question, however, it may be proper to consider first whether the nature of a distress taken for rent has not been changed in some degree by our act of assembly of the 21st of March, 1772; which, among other things, enacts, that where the tenant or owner of goods distrained for rent, shall not, within five days next after such distress taken, and notice thereof, replevy the same, then the person dis-

training *shall and may* with the sheriff, under sheriff, or any consta-ble, &c., cause the goods to be appraised by two respectable freeholders; and after such appraisement, *shall or may,* after six days public notice, lawfully sell the goods for the best price that can be gotten for the same, for and towards satisfaction of the rent and the charges incurred, leaving the overplus, if any, in the hands of the sheriff, under sheriff, or constable, for the owner's use. Now, if upon a fair construction of this act, it is made the duty of the party distraining to sell the goods distrained, it will go far to show that the nature of a distress taken for rent is thereby materially changed from what it was by common law, and that the goods instead of being taken as a mere pledge or a *nomine pœnæ,* with a view to induce the tenant or owner thereof to pay the rent due, are to be regarded more properly as taken in execution, because the result of the proceeding directed by the act is precisely similar to that of an execution; that is, a sale of the goods after six days' public notice, and an application of the money arising therefrom to the payment of the rent or debt claimed, and the costs and charges incurred by the proceeding in either case, and the surplus, if any, to be paid to the owner of the goods. The words of the act in this respect are, that the person distraining *shall and may,* &c. cause the goods to be appraised, &c., and after such appraisement, *shall or may* sell. In *Rex and Regina* v. *Barlow,* (2 *Salk.* 609,) it is laid down as a gene-ral rule, that where a statute directs the doing of a thing for the sake of justice or the public good, the word *may* is the same as the word *shall*; thus 23 Hen. 6, says, the sheriff *may* take bail; this is construed he *shall*; for he is compelled to do so. And accordingly, in the case just cited, it was held, under the statute 14 Car. 2, c. 12, which declares that church-wardens and overseers, &c. *may* make rates to reimburse the constables, that an indictment would lie against them for not doing so. And in *Hardy* v. *Barn,* (5 *Term,* 540,) and *Rolles* v. *Rosewell,* (*Id.* 538,) after great consideration, it was held that the plaintiff, under the statute 8 and 9 W. 3, c. 11, s. 8, which enacts, " that in actions of any penal sum for non-perform-ance of covenants, &c., the plaintiff *may* assign as many breaches," &c., was bound to do so; that the statute in this particular was compulsory on him. See 2 *Saund.* 187 a, note (2.) In *Stamper* v. *Miller,* (3 *Atk.* 212,) Lord Chancellor HARDWICKE admits that the words *shall or may,* in acts of parliament have been considered as imperative. And in *Bakewell's case,* (1 *Vern.* 153,) the Lord KEEPER declared, that though the words of the act of parliament, authorising him to grant a commission of bankruptcy, were, that the chancellor *may* grant a commission, yet that *may* was in effect *must,* and had been so resolved by all the judges. The same rule of con-struction, in regard to the words *shall or may,* has been admitted to be correct by Chancellor KENT, and likewise by the Supreme Court of the state of New York, when used in a statute, where the public

(Quinn v. Wallace.)

interest and rights are concerned; but held that it did not extend to
a statute, declaring that an *individual* or *individuals shall or may*
do certain acts, or have a certain remedy, that is intended for his
or their own benefit. See *The Newburgh and Coshecton Road Co.*
v. *Miller et al.,* (5 *Johns. Ch. Rep.* 101, 102. 112, 113,) and *Malcom*
v. *Rogers,* (5 *Cowen Rep.* 188.)

The act of assembly, however, in question, is not a private act,
nor yet an act authorising a certain individual or individuals to do
any particular act, or to adopt and pursue a special remedy for his
or their benefit; but on the contrary, is a public act made alike for
the benefit of all the citizens of the commonwealth standing in the
relationship of landlord and tenant, where rent has become payable
and remains unpaid. The right to recover rent by distress, and the
course of proceeding authorised in order to effect a recovery, is un-
questionably a matter of public concern. It is a remedy given to
all who have claims for rent due them, that they may be enabled to
recover the same; and in order to effect this, the act of assembly
has declared and directed the course of proceeding just as the sta-
tute of 8 & 9 Will. 3, c. 11, s. 8, has done in all cases of plaintiffs
suing for penalties upon bonds conditioned for the performance of
collateral acts. The direction in the latter has been held, as shown
above, to be compulsory on plaintiffs in such cases: and why shall
not the direction in the former, which is quite of as general concern,
be regarded as compulsory upon landlords in all cases of distresses
taken by them for rent. Though the act was passed for the benefit
of the landlord entirely, yet it may be said to have been made for
the benefit of the tenant in some respects as well as for that of the
landlord: because if it were not to be held compulsory on the land-
lord to make sale of the distress, it would be putting it in his power
and discretion to deprive the tenant of all advantages which he
might possibly derive from a sale being made as soon as the direc-
tion contained in the act would admit of it. For instance, if the
landlord is not bound to proceed and make a sale of the goods dis-
trained, which, say, are perishable, but at liberty to retain them as
a pledge, beyond that time, until they shall be redeemed by the
tenant's paying the rent, and they happen to perish or are destroyed
without any default on his part, after the time when he might have
sold them and had his rent thereby paid, then he may take another
distress or sue the tenant for the rent. *Doct. & Stud.* page 13. Dial.
1, ch. 5, page 193, 194. Dial. 2, ch. 27. *Vaspor* v. *Edwards,* (12
*Mod.* 663.) *Dyer,* 280, b. The advantage which would have resulted
to the tenant in such a case is obvious, if a sale had been made: and
it is not a satisfactory answer to say that the tenant might have
redeemed, because he might not have been able; or at least not so
without making a sacrifice equal to his ruin. To allow the landlord,
therefore, a discretionary power under the act to sell the distress,
would in some instances enable him to make an oppressive use of

it, which could not have been intended by the legislature.  Besides, by the act, certain things are made liable to be taken as a distress, which were not so at common law, either because they could not be returned in as good plight as they were when taken, such as sheaves or shacks of corn, and the like, Co. Lit. 47 a, or such as corn and grass of all sorts; also hops, roots, fruits, pulse or other product whatever, which shall be growing on any part of the estate demised, because they were affixed to the freehold.   By the express terms of the act, these latter articles are to be appraised and sold as other goods; and the purchaser thereof shall have free egress and regress to and from the same where growing; to repair the fences from time to time, and when ripe, to cut, gather, make, cure and lay up and thresh, and after that to carry the same away, in the same manner as the tenant himself might have done had the distress never been made. But it is perfectly evident that they cannot be taken as a distress under the act, unless they were sold as early as the directions of the act will admit of, and that too while they are standing or growing on the land, and before they are severed from it; for it is only the purchaser of them who has, by the act, any power given to him to sever and remove them.   The landlord cannot do so; he can do nothing with them after the seizure, except it is to have them appraised and sold.   It may also be remarked that they are mostly all of a perishable nature, and liable to spoil in a very short time, when in a state of maturity, if not severed from the land and taken care of, in the course of a few days.   Indeed, unless this be done, they would soon become worthless; which goes to show pretty clearly that the legislature intended that the landlord *should* sell, and that he should have no discretion to avoid it unless by the consent of the tenant or owner of the goods, or prevented from doing it by the payment of the rent or suing out of a replevin.   But further, the plain import of the words *may and shall*, I take to be imperative.   It will scarcely be denied, that if the word *shall* alone had been used, it would have bound the landlord absolutely to make a sale of the goods; but it is difficult to conceive how the superadded words *and may*, can restrain or qualify the import and force of the preceding word *shall*.  If the legislature had intended that it should be discretionary with the landlord whether he should sell or not, they ought, and I take for granted, would not have used the word *shall*, because its proper meaning is repugnant to such intention. They might possibly have used the word *may*, but even that may be thought questionable, as it has, when standing alone, in the construction of statutes been held to mean *must*: but when it is used in connection with the word *shall*, and united to it either by the conjunction *and* or *or*, its meaning ought to be regarded as imperative, unless it should appear to have been intended otherwise from the context.   It must be admitted, however, that Chief Justice DALLAS and Mr. Justice BAYLEY have expressed opinions in opposition to

this.  In *Hudd* v. *Ravenor*, (2 *B. & B.* 662; S. C. 6 *Eng. Com. Law Rep.* 306,) where it was ruled that the plea of a former distress for the same rent was not good, because it was not alleged that the rent was satisfied, DALLAS, C. J., in delivering his opinion, as to the plea, seems to have thought that unless the words *shall and may*, used in the statute 3 Wm. & M. sess. 1, c. 5, s. 2, from which, the section of our act under consideration is merely a copy, could be construed as giving only a discretionary power to the landlord to sell, the plea might have been considered good.  The main, and indeed only objection mentioned by him, to its being considered compulsory on the landlord, is, that after a seizure, he could never come to any terms of agreement with his tenant.  But surely this is a great mistake; because the parties, by their agreement, may make the law what they please in this respect.  And Mr. Justice RICHARD-SON seems to have thought so, when he said in the same case, " I am not satisfied that the statute of W. & M. is imperative as to the sale; but suppose it is so, that statute never meant to preclude the parties from ending the proceedings."  And Mr. Justice BAYLEY, in *Lear* v. *Edmonds*, (1 *B. & Ald.* 157,) where a similar plea was put in by the defendant, and considered not good, because the statute of W. & M., as he says, is that the party distraining *may* sell the goods, not that he *must* sell; and if so, then he asks, does not the landlord stand as he did at common law before the statute?  for it is not aver-red that the goods were sold.   It is sufficient answer to Mr. Justice BAYLEY, that he does not quote the words of the statute correctly; for he has omitted the word *shall*, as if it were of *no import or force whatever.   These opinions as to the construction of the stat. W. & M., though coming from very highly respectable judges, would appear to have been advanced without much consideration, without any satisfactory course of reasoning to support them, and in direct opposition, as I think I shall show in the sequel, to the principle laid down and established in the King's Bench, in *Vaspor* v. *Edwards*, or *Eddowes* in most of the books.   They therefore can have no influence upon our judgment in giving to our act, in relation to the same matter, a different construction, when its various provisions, as well as the language employed, would seem to require it.  Considering, then, as we do, our act as to the sale of the goods, to be imperative on the landlord, it would seem, therefore, to give to the distress the character of an execution.  The only difference which now exists between goods taken by the landlord as a distress for rent, and those taken in execution by the sheriff, is that the former are repleviable, whereas the latter are not.  But this is entirely immaterial, in regard to the legal effect of a distress in discharging the rent, as long as the goods are not taken from the landlord by a replevin; and even if they are, it can make no difference, because they must be restored to him again, provided the distress was lawfully taken.  The legal effect of the sheriff's taking goods of the defendant in execution to

(Quinn v. Wallace.)

the amount or value of the debt is well settled to be a discharge of the defendant from the judgment, and *all further execution*, although he does not satisfy the plaintiff. *Slie* v. *Finch*, (2 *Roll. Rep.* 57; S. C. *Cro. Jac.* 514.) *Clerk* v. *Withers*, (6 *Mod.* 292. 299; S. C. 1 *Salk.* 323,) or has not returned the writ; and it will be a bar to a *scire facias* on the judgment, so that the plaintiff cannot have a second execution. *Mountney* v. *Andrews*, (*Cro. Eliz.* 235; S. C. 4 *Leon.* 150,) and S. P. in *Clark* v. *Withers*, (2 *Ld. Raym.* 1072; 2 *Saund.* 47 a, note 1.) And why should not the same doctrine and principles be applied to goods distrained by the landlord when of sufficient amount to pay the rent. If there be any difference in reason between the two cases, it is against the landlord, for he either distrains himself in person or by a bailiff of his own appointment, and therefore has the goods in his own hands and under his own control, so that he can by a sale thereof satisfy the rent; whereas the execution creditor is in some degree dependent upon the sheriff's movement for obtaining actual satisfaction of his debt. In *Mountney* v. *Andrews*, (*Cro. Eliz.* 237,) the defendant pleaded to a *scire facias* upon a judgment against him, that upon a *fieri facias* directed to the sheriff of the county of Leicester for levying the debt, he by force thereof took divers sheep of the defendant's for the debt, and yet detaineth them. And this was held by the court to be a good plea, notwithstanding it was not alleged that the plaintiff was thereby satisfied. The value or sufficiency of the sheep to satisfy the debt is not set forth; and it is plainly inferable that they had not been sold or disposed of by the sheriff, but still remained with him. The principle of this case is recognised and approved by three of the judges in *Clark* v. *Withers;* first, by GOULD, J., (*Ld. Raym.* 1072;) second, by POWELL, J., (1074;) and third, by HOLT, C. J., (1075.) Seeing, then, it is not requisite that the defendant should set forth in his plea the value or sufficiency of the goods taken in execution to satisfy the judgment, it follows of course, that he cannot be required to prove more than what is contained in it; so that if the goods have been found insufficient to satisfy the judgment, it will lie upon the plaintiff to prove it. Besides, as it has ever been considered oppressive, and therefore unlawful, to make a second seizure of the defendant's goods for the same debt, or a second distress of the tenant's goods for the same rent, without some necessity or good cause for it; the presumption is, that goods sufficient were taken in either case in the first instance, and therefore it is that it rests upon the plaintiff in the judgment, or the landlord claiming the rent, to repel this presumption by evidence, and to show some justifiable cause for resorting to a second seizure or distress. This doctrine is laid down and established by the decision of the Court of King's Bench, in *Vaspar* v. *Edwards*, or *Eddowes*, as the defendant is called in most of the reporters, (12 *Mod.* 658; 1 *Ld. Raym.* 720; 1 *Salk.* 248;) a cause that was spoken to several times by counsel at the bar, and one in

VOL. VI.—59

(Quinn *v.* Wallace.)

which the judges, after great consideration, delivered their opinions *seriatim;* GOULD, J., dissenting (not as to the goodness of the plea, but in regard to the replication) from HOLT, J., and POWIS and TURTON, Justices. The action was trespass *quare clausum fregit,* and feeding on the plaintiff's grass with a pig. The defendant pleaded not guilty as to all except the trespass by the pig; and as to that, that the plaintiff had taken the pig *doing the damage,* and impounded it in a common pound at J., and there the said pig *ex causa predicta detinuit.* The plaintiff, by his replication, confessed the taking and impounding, but alleged that afterwards the pig, without his consent and will, did escape out of the pound; to which the defendant demurred. The plea was held good, and the replication of the plaintiff bad, because he did not undertake to show thereby that the escape was without his default. The distress, it will be observed, being taken *damage-feasant,* was taken merely as a pledge, and could not be sold by the plaintiff; which made the case stronger for him than it would have been, could he have satisfied himself by a sale of the distress. The court held that before the distress is made in such case, the plaintiff has choice either to distrain or bring his action of trespass; but having made his election and taken a distress in that case, he could never have recourse to any other remedy till that which he had adopted proved ineffectual through the act of God or the wrong of the defendant, neither of which was alleged by the plaintiff in his replication. It is clear that the judges, in delivering their opinions as to a distress being *prima facie* a bar to a second distress or another remedy, make no distinction between a distress for rent and a distress *damage-feasant:* so that if a distress be taken for rent, an action of covenant or debt, or case for use and occupation, cannot be supported for it afterwards without the landlord's showing that he had lost the benefit of the distress without any default upon his part; or that it had, upon a sale thereof, proved insufficient to pay the whole of the rent, and that his action was only brought for the residue. "It is enough," says Lord HOLT, "for him that is distrained to show a distress taken, and it behoves the other side to show how the possession of it happened to be lost; and since he has lost the possession, he knows best how." And so it may be said in the case before us, that it was enough for the plaintiff to show a prior distress taken for the same rent, but after that was shown, it behoved the defendant, who had the possession and control of the distress, to show what had become of or been done with it, and if he has parted with it, he best knows, and ought therefore to show it. He has evidence of its value within his knowledge, or at least must be presumed to have, which the plaintiff cannot be expected to have, as it was his duty to have it appraised: and if he sold it, he ought to give an account thereof, by showing the prices at which the articles distrained on were respectively sold; otherwise, the fair presumption is, that he is fully paid the amount of his rent;

(Quinn v. Wallace.)

and especially as would seem from the paper book here, that instead of evidence being given going to repel this presumption, evidence was given on the part of the plaintiff showing that the former distress was of sufficient value to satisfy the whole amount of the rent claimed. And these are the principles which would seem to govern in the case of a sheriff who has taken goods under an execution placed in his hands, and would make it his duty to show by proof, after evidence given of his having taken the goods, how he had disposed of them, and what they had brought at sale, if any appeared to have been made. *Beales's Executors* v. *The Commonwealth, for*, &c., (11 *S. & R.* 299. 304.) *Little* v. *Delancey*, (5 *Binn.* 272–3.) We therefore think that the District Court was wrong in charging the jury, that the plaintiff was bound to show that the goods first distrained had been converted into money and were sufficient to pay the whole rent. On the contrary, we are of opinion, that it was incumbent upon the defendant, in order to justify his making the second distress, to show how and in what manner the first had been disposed of by him, as it was entirely under his control, and to show that, upon a lawful disposition made of it by him, it had proved insufficient to pay the whole of the rent. We consider the cases of *Lear* v. *Edmunds, Hudd* v. *Ravenor*, noticed before, and *Lingham* v. *Warren*, (2 *B. & B.* 36 ; S. C. 6 *Eng. Com. Law Rep.* 10,) containing the same principle, as repugnant to the principle of *Vaspar* v. *Eddowes*, which may be regarded as a binding authority upon us, it having been decided before the revolution, and which settles the principle that a party having a right to distrain, cannot, after having made a distress, resort to any other remedy for the same cause, without showing that the distress has been rendered unproductive, either by the act of God or the act of the person from whom it has been taken. Suppose, in conclusion, that Collins, the immediate lessee of Willing, the landlord in this case, had replevied the first distress, as he might have done before the second was taken, would it not savour of great injustice and oppression to hold that Willing or his bailiff was justified in taking the second, without proving or showing that the first was of insufficient value to satisfy the rent, and that more property could not be found then to distrain on ; or that some mistake, such as might readily happen, had been made in respect to the value of the first ? It really does appear that no other than an affirmative answer can be given to this question. The judgment is reversed, and *a venire de novo* awarded.

Judgment reversed ; and a *venire de novo* awarded.