Bnockkxbroügii, J.
It is a well established principle in England, that if one man purchase an estate in *576 lands, and do not take the conveyance in his own name, ** but in that-of another, the trust of the legal estate re-suits to him who pays the purchase money. This trust results by the mere operation of law, though the person ]'n whose name the conveyance is taken executes no declaration of trust. Sugden on Vendors, ch. 115. § 2. p. 443. Gascoigne v. Thwing, 2 Vern. 366. Ross v. Norvell, 1 Wash. 16. Boyd v. M’Clean, 1 Johns. Ch. Rep. 586. The proofs however ought to be very clear, if the trust does not arise on the face of the deed itself. Ibid. And the resulting trust may be proved by parol evidence, after the death of the person in whose name the conveyance is taken. Sugden on Vendors, pp. 444-5. Lench v. Lench, 10 Ves. 511.
The 7th section of the english statute of frauds declares that all declarations or creations of trust and confidences of any lands &c. shall be manifested and proved by some writing signed by the party &c. And the 8th section provides, that “ where any conveyance shall be made of any lands &c. by which a trust or confidence shall or may arise or result by the implication or construction of law, such trust or confidence shall be of like force and effect as if the statute had not been made.” These clauses are not found in our statute of frauds. If in England the courts have decided that where the conveyance is made to a third person, and not to the purchaser, there is a resulting trust to the man who advances the money, much more ought that decision to be made here, where there is no law directing declarations of trust to be in writing.
In this case it is proved that John Adams opened- a treaty with Marx, for the purchase of the lots on his own account; the price and the terms were agreed on between them; a memorandum of the bargain in writing was signed by Marx as vendor, and the said John Adams as vendeethey agreed that the purchase money should be secured by John Adams giving his notes *577 with Richard Adams as indorser, and by a deed of trust , on the property. When the parties met to perfect the bargain, the form of the security was changed. Richard gave the notes, and John was the indorser; the deed was made by Marx to Richard, and he cousequeutly executed the deed of trust. But possession was given to John; he employed the architect to plan the hotel; he borrowed money to purchase materials for carrying on the buildings; he paid the workmen; he caused the erection and completion of the large and expensive superstructure. All this was known to Richard Adams, and he had a view of the daily progress of the work: he lived to see the house advanced to the second story: he frequently spoke of it as John's property, and expressed anxiety about his undertaking. John also purchased two other tenements, adjacent to the hotel lots, which were indispensable appendages to the hotel. These facts prove that John Adams was not only the possessor, but the owner and proprietor of the lot in question. Who then paid the purchase money ? When the first note was becoming due, it was deposited in the bank where it was payable; no communication was hud with the parties, and it was paid at maturity. There is no direct evidence by whom it was paid ; and from the face of the paper itself, a presumption would arise that it was paid by Richard Adams the maker, since he was directly bound for the payment, and the indorser only collaterally bound. But this presumption is liable to be repelled, and is, J think, clearly repelled by the facts which I have enumerated. Accordingly Marx considered that it was paid by John Adams.
The second note arrived at maturity after Richard Adams died. John Adams was one of his executors, and received large funds from the estate; but it does not sufficiently appear that the note was paid out of those funds. It appears, indeed, that at some period *578 the funds of the estate and the proper funds of John . . f Adams were mixed together, and John Adams checked on that mixed fund, as his occasions required. But we know that heavy drafts were made by him on that fund, as executor he thought he had a right to make, and for purposes which he supposed were to benefit the estate; and I think it is impossible to conclude from the evidence that he had not a sufficiency of his proper funds in bank to pay this note. It is proved by Marx, that John Adams applied for indulgence as to this note, which was not granted, and that the note was paid at maturity. I conclude it was paid by him from his own funds; as well as so much of the third and last note as was paid, that amount having been checked for by him.
I think, then, that this is a case in which the rule as it is understood in England will strictly apply. The purchaser of the land having paid the money, the trust results to him by operation of law, although the conveyance was made to another.
Nor do I think that either the words or spirit of our statute of frauds will exclude parol evidence in a case like this. The act says, “ No action shall be brought upon any contract for the sale of lands, or the making any lease thereof for a longer term than one year, unless the promise or agreement &c. or some memorandum or note thereof, shall be in writing.” There is no pretence of any contract of sale or lease between Richard Adams and John Adams. The deed shews a sale between Marx and Richard Adams; and John Adams, who is not named in the deed, but who has been in possession ever since the sale, and has laid out large sums of money on the land, asks to be allowed to prove by witnesses, not that there was any contract of sale between Richard and himself, but that Richard holds under that deed merely as his trustee. The 4th section of the english statute uses broader terms than ours. It *579 forbids an action, “on any contract or sale of lands, . . . . . or any interest m or concerning them, without writing. These words are omitted in our act; yet their insertion in the english statute was not deemed sufficient to in-elude declarations of trust, which would have been provable by parol testimony, but for the 7th and 8th sections before mentioned.
Upon the whole matter, I am for reversing the decree, dissolving the injunction, and dismissing the bill.
Carr, J.
The only question in this cause calling for examination is (as, it strikes me) whether we can read the parol evidence introduced to prove that the ground on which the Union Hotel stands, was purchased by John Adams in his own right, and paid for with his own money. This, it is contended, we are forbidden to do by the statute of frauds, as the deed for the land was executed to Richard Adams, and recites that he bought the property, and paid the purchase money. In England it is settled by many cases that such evidence would be received. Their statute of frauds differs from ours with respect to trusts, in this, that by their 7th section it is enacted that all declarations or creations of trusts See. of any lands &c. shall be manifested and proved by some writing &c. To which section there is a proviso, that where any conveyance shall be made of lands &c. by which a trust or confidence shall or may arise or result by implication or construction of law &c. such trust &c. shall be of the like force and effect as if the statute had not been made. Whereas, by our statute, the whole subject is omitted. We have neither the enacting clause, nor the proviso which that clause rendered necessary. How stands the subject then with us ? It seems clear that in England it was not supposed that the general declaration of the statute, that no action should be brought upon any contract for the sale of lands &c. unless in writing, would compre *580 hend cases of trusts or confidence in land; and there- . fore the 7th section was made for that particular purpose : but as it was not meant to include trusts resulting by implication or construction of law, they were specially excluded from the operation of the section by a proviso. The effect of this (as many cases prove) is, that these resulting trusts remain as they were before the statute, and may be raised and proved by parol. This, we cannot doubt, was known to our legislature when, in 1787, they transferred the statute of frauds to our code; and with this knowledge, when we see them leaving out entirely this part of the english statute, can we doubt that they intended to leave this subject of resulting trusts, or at least, trusts by implication and construction of law, as it stood before the act ? I think this is the fair conclusion ; and it is strengthened by the cases in our books. Ross v. Norvell, 1 Wash. 14. Robertson v. Campbell, 2 Call 421. With respect to resulting trusts in England, chief baron Eyre, in Dyer v. Dyer, 2 Cox’s C. C. 91. says—“ The clear result of all the cases without a single exception is, that the trust of a legal estate, whether freehold, copyhold or leasehold; whether taken in the names of the purchaser and others jointly, or in the names of others without that of the purchaser; whether in one name or several; whether jointly or successively,—results to the man who advances the purchase money. This is a general proposition, supported by all the cases, and there is nothing to contradict it; and it goes on a strict analogy to the rule,of the common law, that where a feoffment is made without consideration, the use results to the feoffor.” It is equally clear that the facts constituting this resulting trust may be established (in England) by parol evidence. Sugden on Vendors, 417. and the cases cited by him. Boyd v. M’Clean, 1 Johns. Ch. Rep. 582. where all the cases are reviewed. It is laid down, however, in the same cases, that where the evidence is *581 merely parol, although it is clearly admissible, it will be received with great caution; and this I think a very proper qualification of the rule. These considerations have led me to conclude, that in the case before us, the parol proofs going to establish that the purchase was made and the purchase money paid by John Adams, ought to be received. Do they clearly establish these facts ? In my mind, they fix them beyond the reach of doubt.
I will not detail the evidence; it seems to me too plain. I will therefore only add, that 1 think the decree should be reversed, the injunction dissolved and the bill dismissed.
Brooke , J.
The parol evidence in the record proves that John Adams bargained for and purchased the lot on which the Union Hotel stands, of Marx the vendor; that the contract was reduced to writing in the name of John Adams; that he took possession of the lot, and treated it as his property, by erecting the hotel on it at great expense, with the daily knowledge of Richard Adams, who made no claim to it, and at all times spoke of it as the property of his brother John, even on his death bed ; that John Adams paid the purchase money, except a part of the last instalment, paid by the bank of the United States; that the hotel was erected in part on a lot confessedly the property of John Adams, without any claim to it by Richard Adams, who lived near it and saw it every day; that the general understanding was, that it was the property of John Adams: and the only opposing testimony is that the deed from Marx the vendor was made to Richard Adams, and that he was the maker of the notes for the payment of the three instalments of the purchase money, without the slightest evidence that he paid a cent of it. Why the deed was made to Richard Adams, and the notes made by him and indorsed by John Adams, does not appear, except *582 that the witness Marx says it was by the desire of John 7 , . 7 . ... Adams; and the only conjecture is, that it was to mdemnify Richard Adams for any money he might advanee in payment' of the purchase money; to secure which Richard Adams gave a deed of trust to the vendor Marx. Upon this state of the facts, I think the only question is whether parol evidence was admissible to prove them. That such evidence to prove facts that lay the foundation for a resulting trust, or trust by implication of law, was admissible by the english cases, I think cannot be doubted, though there has been some diversity in them. In Sugden on Vendors, p. 443. it is laid down, that although the person in whose name the conveyance is taken executes no declaration of trust, yet a trust will result for the person who paid the purchase money, by operation of law; this species of trust being expressly excepted out of the statute of frauds (see the cases there cited); and that such trusts may be asserted after the death of the nominal purchaser, as in the case before us. He cites the case of Lench v. Lench, 10 Ves. 511. But, for the english authorities on this point, I refer to the case of Boyd v. M'Clean, 1 Johns. Ch. Rep. 582. But it is insisted that our statute of frauds differs from the statute 29 Charles, and that resulting trusts and trusts by implication of law are, by construction, within its provisions. If so, it would cut up a valuable portion of equity jurisdiction, and promote fraud instead of preventing it. How does our statute in this respect differ from the english statute ? The 7th section of the statute of Charles enacts, that all declarations or creations of trusts &c. of any lands &c. shall be manifested and proved by some writing: to which there is a proviso, that where any conveyance shall be made of lands &c. by which a trust or confidence may arise or result by implication or construction of law &c. such trusts &c. shall be of the like force and effect as if this statute had not been made; thereby limiting the *583 operation of the 7th section to declarations of trusts, r . , .... and excluding resulting trusts and trusts by implication of law. Our statute enacts, that no action shall be brought &c. or upon any contract for the sale of land &c. unless the promise or agreement upon which such action shall be brought See. shall be in writing Sec.—not saying a word in its whole context as to declarations of trusts, or trusts resulting by implication of law, and in this respect differing from the english statute, that it does not require even declarations of trusts to be in writing, as is required by the 7th section of that statute, but leaves the law as to these trusts, and trusts by implication, as it stood before; so that even parol declarations of trusts, inhibited by the 7th section of the english statute, are exposed by our statute to parol testimony,—more dangerous than parol evidence of facts from which to infer a resulting trust, because more liable to be contradictory.
On the whole, I think the decree must be reversed, the injunction dissolved, and the bill dismissed.
Tucker, P.
The point upon which this case turns is the right of property in the Union Hotel with the appurtenances. By the complainants it is contended that that property belonged to Richard Adams their testator, that it was conveyed by him to trustees to secure the payment of the purchase money to Marx, and that they are entitled to redeem it by paying up the balance of the purchase money which the bank had paid to Marx, and on payment of which they had received an assignment of the deed of trust. The bank, on the other hand, claiming under a mortgage of John Adams, insists that the property which was originally the property of Marx, was purchased by John Adams of Marx, and that he and not Richard, Adams was the true and real owner of the estate. The evidence in the case, if not inadmissible, establishes this fact, I think, incontrovertibly. *584 I cannot see any -just foundation for the opinion that the J J r parol evidence was so conflicting as to compel the court to look to the deed as containing the real transaction. The testimony proves beyond question, that John Adams purchased the lots from Marx for 25,000 dollars; that the written agreement was entered into between them; that Richard Adams (though a resident in Richmond) had no agency or part in the purchase; that he was not known in the transaction, and that the treaty was altogether on the part of John Adams. It is true that for some reason about which we must be compelled to speculate, the deed was, at the request of John Adams, executed to his brother, and his brother executed a contemporaneous deed of trust, and gave his negotiable notes, in which he appears as principal and John Adams only as indorser. But the testimony abundantly shews that notwithstanding this form of the transaction, the substance of it was a purchase by John Adams for himself, and the conveyance to his brother was probably for the purpose of indemnity, in the event of his being compelled to pay the purchase money. John Adams certainly paid the first instalment, and out of his own funds, whether borrowed of the bank or of his brother, or obtained elsewhere. Why should this payment have been made by him, rather than by his more wealthy brother', who appeared as principal in the negotiable ■notes? There could be no motive for his making it, if his brother was the purchaser and x-eal owner of the estate. But if he wras the purchaser and owner, it was his duty and interest to pay off the notes at maturity, and relieve the property from the incumbrance. He does so accordingly: he takes possession of the premises, he proceeds to purchase two other lots, his title to which is undeniable, and he goes on to erect improvements upon the whole of the lots, inseparably connected with each other. In doing this, he alone is seen in treaty with the builder, he alone plans and executes, *585 and, as far as we can see, he alone meets all the heavy responsibilities of this most extensive engagement. All this is under the immediate eye of his brother, before whose death considerable progress was made in the splendid establishment in question, without any of property or exercise of ownership on his part, and without any act from which it could be inferred that he had any other interest in the building than that which was dictated by fraternal affection. .Pulling states that he frequently heard from both of the parties that the property was John's, and on his death bed Richard Adams expressed a wish to see the Union Hotel finished, that Ire might see his brother enjoy it; having expressed to another witness his fears “ that if John Adams died in less than seven years, it would ruin him.” Such a declaration is incompatible with the notion that he was himself the owner of the property. It is incompatible with the notion that John Adams was his agent; buying for him, contracting for him, and involving him; all of which must have been the case, if he had been the owner. We must remember that if we are, from the deed, to take him to be the owner, he was owner in severally, and not in common with John Adams, and all the responsibility was on him. Yet he pretends to no interference ; he asserts no claim of property, he neither contracts nor supervises, while thousands are expended in this large adventure; and instead of fears for his own loss, he is apprehensive only of the ruin of his brother. After his death, the conduct of all the parties interested is equally incompatible with any notion on their part, of the title of Richard Adams. The building proceeds under their eyes, it is completed and rented out by one who is now said to have had no title to it, and part of them are privy to the mortgage of the whole subject by John Adams, to secure immense sums which he had borrowed of the bank and expended in this costly undertaking. I do not deny that Richard Adams probably *586 made him large advances in his lifetime, and that he occasionally availed himself of the funds of the estate in his hands as executor, to meet his heavy engagements. Such advances are proved to have been made; whether as a l°an ot gift, would seem to be doubtful according to the testimony of Pulling: but those advances, if meant as a loan, being ex post facto, could not make the property his, unless by agreement; nor do. they form even a lien on the lots, as such lien does not appear to have been contracted for. Upon the whole, therefore, I am well satisfied that John Adams was not only the purchaser of the lots from Marx, but that the deed to Richard Adams was merely executed as matter of arrangement, by which he was to be secured against his responsibility for the purchase money, while John Adams was the undisputed owner of the property. Under this view of the case, it is not only intelligible why John Adams should have made the first payment in the life of his brother, and should have encountered all the cares, and trouble, and anxieties, and expenses attendant upon so extensive an improvement, but we are furnished with a ground upon which to rest the presumption that the subsequent instalments of the purchase money and the cost of the building were paid by him out of his own funds—borrowed, if you please, either of the bank or of his brother, or used perhaps, to some unknown extent, out of the executorial fund. But the fact that these funds were borrowed of his brother, or even withdrawn from the estate, cannot make the property his, or even constitute a lien upon it, as none was contracted for. We cannot follow the money thus employed, into the real estate here. Though money is sometimes followed into land, where trust funds have been misapplied, it is only in a clear case, and where the amount can be ascertained. And moreover where only part of the consideration is paid out of the funds, there can be no resulting trust; and where a payment or advance of *587 money is after the purchase has been completed, no ^ 1 • • • i 7j trust will be raised by it, and it can give no title. Bots-ford v. Burr, 2 Johns. Ch. Rep. 405. 1 Hov. on Frauds, 471.
Believing, then, that the evidence clearly establishes John Adams’s title to the property, if we are not excluded from the inquiry by the statute of frauds, let us next inquire whether under that statute it be incompetent to establish this trust by parol evidence: and in every point of view in which I can consider it, I am satisfied it is not. The statute of frauds in England is more extensive than our own, as it contains in the 7th section a provision that all declarations of trust must be in writing, except such trusts as “ arise or result by the implication or construction of law.” Before that statute, declarations of trust might have been made by parol; and as our statute contains no provision on the subject, it is possible that a verbal declaration of trust, if clearly proved, might be sustained. Thus, I imagine, it has not unfrequently occurred in Virginia that husband and wife have conveyed to a third person, with intent that he should reconvey to the husband, but without any written declaration of trust. A case of this kind has recently occurred, and is under advisement. Yet I have never heard it questioned that the trust might be sustained, though not in writing, and though it be not a resulting trust. So with respect to deeds absolute on their face, when the real transaction was a mortgage. Whatever may be the doubts elsewhere, it has been with us long established that the equity of redemption may be sustained by parol evidence, and that a deed absolute on its face may by such evidence be turned into a mortgage. Ross v. Norvell, 1 Wash. 14. Robertson v. Campbell, 2 Call 421. Conway v. Alexander, 7 Cranch 218. In England, it has been admitted that a deed though absolute will be considered a mortgage, where the trust is confessed by the mortgagee. 1 Pow. *588 on Mort. 145. a. And so where there was an omission to execute the defeasance. 3 Atk. 389. And the intent of the parties may be explained to have been a mortgage, though the deed be absolute. 2. Fonb. 267. Indeed I do not perceive how this matter could be doubted in England; for as the mortgagee is trustee for the mortgagor only by construction of the courts of equity, the case seems to be expressly within the proviso which excludes trusts by construction of law from the operation of the statute. Be this as it may,—I presume it is, with us, competent to prove by parol that an absolute deed was executed upon the secret trust that the grantor should be entitled to redeem.
If this principle be correct, I apprehend it is decisive of this ca.se. For the conveyance to Richard by the direction of John, for the security of money, constituted the transaction a mortgage in effect. And though the deed is absolute on its face, yet the defeasance may be proved by parol; and I have already said that I think it is so proved.
We are brought to a like conclusion, indeed, if we consider the case in reference to other established principles. Thus if A. purchases an estate with his money, and takes a deed in the name of B. a trust results to A. and such resulting trust may be proved by parol. Botsford v. Burr, 2 Johns. Ch. Rep. 405. Boyd v. M’Clean, 1 Johns. Ch. Rep. 582. Willis v. Willis, 2 Atk. 71. 2 Mad. 97. Rider v. Kidder, 10 Ves. 360. Gascoigne v. Thwing, 1 Vern. 366. Sugd. 443. 444. and the cases there citéd. And this is in conformity with the course of decision in the analogous case of trust moneys, which may be followed into land when they are clearly shewn to have been employed in the purchase of it; and whatever doubt may have been formerly entertained as to the admissibility of parol testimony in such cases, it seems now settled that a claim to land can be supported in such case by parol evidence, on *589 the ground that resulting trusts, or trusts arising by operation of law, are not within the statute. Hov. on Frauds 471. Lench v. Lench, 10 Ves. 517. Indeed if no trust could be good under the statute but those which were declared in writing, there would be of course an end to implied trusts; and the innumerable instances in which equity, for the furtherance of justice to a party, sets up a trust in his favour, would at once be obliterated from its system.
Now in this case the defence set up is precisely that in the cases cited above. It is alleged that John Adams purchased and paid for the estate, but took the deed in his brother’s name. If so, then there is a clear resulting trust; and as resulting trusts are not within the statute, parol evidence is admissible to establish the facts out of which the trust arises.
There is one other view of the subject which I will suggest. It is, that Richard Adams (unless he paid the purchase money, or it was paid out of his funds) had no title, either legal or equitable; not the legal title, for that was in the trustees ; nor the equitable, for, having paid no money and made no contract, he had no equity. The bill therefore cannot be sustained in behalf of his representatives.
I am of opinion to reverse the decree, dissolve the injunction, and dismiss the bill.
Decree reversed, injunction dissolved, and bill dismissed.