Mr. Chief Justice Johnson delivered the opinion of the Court! The objection to the service of the original summons in the case of Neff & Brother instituted in the Circuii Court of the United States for the District of Arkansas, and under the judgment rendei’ed in which the complainants in the original bill claim title, is well taken in fact, but is untenable in point of law. The service did fail to state that the summons was left at the usual place of abode of the defendant, as required by the statute, and might, possibly, upon a direct proceeding in an appellate court, have been reversed. Such a defect, however, cannot operate to render absolutely void the judgment rendered in that case. The Circuit Courts of the United States are not of that special and limited class, to which no presumptions are extended, but on the contrary, they are endowed with such original and general jurisdiction as to entitle them to the benefit of all legal intend-ments necessary to support and uphold their acts until reversed or annulled by a superior tribunal. See Borden et al. v. State, use of Robinson, 6 Eng. 519. The next point made relates to the power of the Circuit Court. of the United States to adopt a certain rule, since the act of Congress of 1842. It is contended that, inasmuch as that act adopts the State law prescribing the form and regulating the proceedings under a writ of execution, the Federal court had no authority to adopt any rule variant from the one therein prescribed, and that therefore the complainants, having purchased under an execution enforced in obedience to such rule and not in strict conformity with the State law, their purchase is void. We deem it unnecessary to investigate the question thus presented, as in no event could it affect the rights of the parties claiming under the execution. The only result of this position, upon the assumption that it is true, would be that the sheriff had failed to observe all the requisites prescribed by the State law, and that therefore irregularities had intervened in the sale. ■ The court of Appeals of Kentucky, in the case of Hayden v. Dunlap, reported in 3 Bibb, at page 219, said, “But were the intention of the Leg-, islature still doubtful the highly inconvenient consequences, which would inevitably result from a construction that would vitiate the sale on the grounds now under consideration, ought, we think, to be decisive against its adoption. If the purchaser of lands under execution might, at any time within which a real action may be brought, have his title impeached by proof that the defendant in such execution had personal estate of which the demand could have been made, .or that the sheriff had not advertised or given notice to the defendant according to law, it must be obvious to every one that no prudent man would bid for land exposed to sale a sum any thing like adequate to its value. Such a construction, as it would render the title insecure, would consequently tend to diminish the price of land sold under execution, and would in so much be prejudicial as well to debtors as to creditors. We must, therefore, conclude that in these respects the act is merely directory to the officer. Without doubt it is his duty to comply with its directions, and for a breach of his duty he would be responsible to the injured party; but such a breach of duty is not in itself sufficient to avoid the sale.” This is doubtless the true doctrine, and it is well sustained not only by reason but also by high authority. See Wheaton v. Sexton, 4 Wheat. Rep. 503. Cox v. Nelson, 1 & 2 Mon. Rep. 95. Rector v. Hartt, 8 Misso. Rep. 448. Cromer v. Van Alstyne, 9 John. Rep. 385. Beeler's heirs v. Bullett's heirs, 3 Marsh. Rep. 281, and Adamson et al. v. Cummins ad., 5 Eng. Rep. 533. But it is insisted that as the complainant Fowler was the attorney of record in the original suit and became the purchaser under the execution, he was bound to take notice of all irregularities. This proposition is too broad to square with the law. The court, in the case already referred to of Beeler's heirs v. Bullett's heirs, said that, “The law directing, first, chattels, then slaves, and lastly land to be taken, is directory to the sheriff. If he violates it to the injury of the debtor in an execution he may be responsible for that injury. But it does not result that the purchaser of lands so taken under execution, even if he be the creditor who has not been instrumental in causing the sheriff thus to violate the law, is to have his title affected especially after he has tried by other fruitless executions to reach other estate before he touched the land. The defendants seem to mistake the law, so far as to suppose that the plaintiff claiming under a sale by execution is bound to show that all the requisites of the law in making the sale have been complied with, instead of placing the onus probandi on the other side, and compelling him who opposes the sale to prove it irregular,” The High Court of Errors and Appeals of the State of Mississippi, in the case of Doe ex dem. Starke v. Gilbert and Morris, also said that, “The law is well settled by an unbroken chain of adjudicated cases, that a mere irregularity for which an execution would be voidable merely, does not affect the right of a purchaser under it. This doctrine was recognized by this court in the ease of Snyder v. Vancompen, decided at the present term. The variance cannot be regarded as any thing more than an irregularity for which the execution would be voidable, and might be set aside on application of the defendants. There was a good judgment to support it; and it was an authority to do all that the decree had authorized. That it authorized a levy on the individual property of the defendants, was evidently a clerical mistake, arising no doubt from a misconception of the decree. On the application of the plaintiif, it might have been amended to conform to the decree, 5 J. R. 100. 1 Cowen, 313. It is admitted that a sale under a voidable execution does not affect the right of the vendee, if he be a stranger to the judgment and execution, and purchase without notice of the defect; but it is said that the rule cannot apply to Starke, who was plaintiff in the execution and therefore bound to know of the defects, and in support of this position the case of Simonds v. Catlin, 2 Caine’s Rep. 61, is relied on. In that case it was held that the plaintiff, who was the attorney in the original suit, was properly chargable with notice of every irregularity attending the exécution, but there is a nia-terial distinction between that case and the one at bar. There, a motion was made after verdict in ejectment to set it aside. “1st, Because a fieri facias issuing into a different county than that in which the venue is laid without a testation, is void.” The court sustained the motion for this and another reason, for both of which the execution was not voidable merely but void; and • was therefore improper evidence. A party to a void process could acquire no title under it, and this seems to be the reason of the case. Starke’s execution was at most only voidable, and did therefore give title to the vendee under it. Even if it could have been set aside on the application of the defendants, they have not thought proper to have this done, and being only voidable, while it is permitted to remain in force, it must have the effect of a regular execution. No person can have a right to question it but the parties, and they must do it directly and not collaterally. 1 Cowen, 313. 16 J. R. 574, Jackson v. Robbins. The language of Chancellor Kent, in the last case cited, may with great propriety be applied in the case before us. In regard to an execution which was irregularly issued, he says, “In the first place, the better opinion is that if execution issued without scire facias, the sale under it would not have been void. It might have been voidable and liable to have been set aside by the Supreme Court, upon motion, as irregular, or by this court, upon error, as erroneous, but until that was done the title would have stood. This question of irregularity or error never can be discussed collaterally in another suit. It is not a point in issue in this action of ejectment.” The opinion from which this language was extracted, was delivered in the court for the correction of errors, and it may be presumed that every point was fully investigated. Let it be supposed then that Starke was a purchaser with notice, of what had he notice ? Of a mere variance which he could have amended and which did not vitiate the execution, but at best only furnished a ground for setting it aside by the direct application of those who were interested. It could not be questioned collaterally. The case would have been different if it had been void. That which is void is essentially inoperative from the beginning and can have no binding quality. We therefore think that the condition of Starke was not materially different from that of a stranger, and the variance between the decree and execution did not justify the ruling of them out.” The principle to be deduced from that case and those cited in it, when applied in this, is perfectly conclusive in favor of the purchase of the complainants. Admitting all the irregularities alleged to exist, they could not be brought up collaterally to affect a sale made under a valid execution, and more especially by a stranger to the original judgment. This is the settled doctrine upon the subject, and will be found to run through all the authorities. The requisites prescribed by the statute in respect to the mode of proceeding under an execution, are merely directory to the officer, and in no case can the purchaser be the sufferer by an omission to observe them, unless he can be shown to have been cognizant of the fact: There is no pretence that the complainants were cognizant of any neglect of the marshal in this particular; and in the absence of such allegation and proof to establish thatfact, their purchase cannot be affected by it. The exhibit of a rule, which purported to have been adopted by the Federal court, and which was somewhat variant from the one prescribed by the State law, it is presumed, was offered by the complainants to meet the charge of irregularity alleged in the defendant Byers’ cross-bill. The complainant in the cross-bill having wholly failed to charge a knowledge of the fraud perpetrated by the officer, if indeed such fraud was committed, no issue could be made in respect to it, and consequently the complainants in the original bill stood exonerated by the law. This being the case, all of their efforts to negative the idea of fraud on the part of the officer were a work of mere supererogation, and whether they succeeded or not; cannot affect the question of then title. The next ground of objection relates to the extent of the lien, created by a judgment rendered in the Circuit Court of the United States. It is urged that the lien of such judgment does not extend beyond the limits of Pulaski county, in which the court is situated. In the case of Conrad v. Atlantic Insurances Co., 1 Peters 453, the court say, the judgments in the Federal courts within the District of New York, are liens upon real property in like manner as judgments of the State courts, and to the extent of the local jurisdiction of the court. And so in every other State the judgments of the Federal courts have the same lien, to the extent of its jurisdiction as the judgments of the highest court in the State.” The case of Doe ex dem. Shrew and Winter v. J. D. Jones, 2 McLean's Rep. 83, is directly in point. The court in that case said, “If, as contended the liens of the judgments of this court be limited to the county in which they are rendered, as in the inferior courts of the State, the judgments of this court have, in effect, no lien. The law of the State which extends the lien of a judgmant of the Circuit Court of the State to any county within which the record of such judgment shall be recorded, can have no application to this court. We have no right under it to require our judgments to the recorded by any clerk of the State court. The law of Indiana regulating judgments and executions, as it stood in 1828, is the law of Congress by adoption. Effect must be given to the provisions of this law, so far, at least, as they are adapted to the organization and powers of this court. If the rules of proceeding by the circuit courts of the State be followed by this court, efFect is given to them without reference to the limited jurisdiction of these courts. The limits of the State, in the exercise of the jurisdiction of this court, are as the limits of the county to the local court. The modes of judicial proceedings and rules of property are different in the different States, and in adopting those rules, Congress designed, as far as prati-cable, to give the same effect to them in the courts of the Union as in the courts of the State. No other course of legislation could have been so well calculated to produce a harmonious action in the judicial departments of both governments. But if a State law, being framed in reference to the limited jurisdiction of the State courts, for this reason cannot constitute a rule for the Federal courts, the legislation of Congress on the subject has been in vain. Such has not been the view taken by the courts of the United States. The law of the State regulates the proceedings of a sheriff on execution. He is to advertise the property, real and personal, &c., but his duties are all limited to the county. The same rule governs the marshal, and operates throughout the State. The principles of the State law are adopted, but the instruments which give effect to those principles are necessarily different," and they are made to operate throughout a more extended jurisdiction.” The case of Massingill et al. v. Downs, 7 Howard’s U. S. Rep., is to the same effect. In that case the court say, “The Circuit Courts of the United States exercise jurisdiction co-extensive with their respective districts. And it has never been supposed that by the process act of 19th of February, 1828, which adopted the process and modes of proceeding of the State courts, the jurisdiction of the circuit courts was restricted. The “process and modes of proceeding” in the State were adopted by Congress in reference to the jurisdiction of the circuit courts and not with the view of limiting the jurisdiction of those courts. In those States where the judgment or the execution of a State court creates a lien only within the county in which the judgment is rendered, it has not been doubted that a similar proceeding in the Circuit Court of the United States would create a lien to the extent of its jurisdiction. This has been the practical construction of the power of the courts of the United States, whether the lien was held to be created by the issuing of process or by express statute. Any other construction would materially affect and in some degree subvert the judicial power of the Union. It would place suitors in the State courts in a much better condition than in the Federal courts.” But if it should be supposed that, inasmuch as the laws of this State, in regard to judgments and executions, were not adopted by Congress until August, 1842, and subject to the rendition of the judgment under which the complainants in the original bill claim title, that therefore the judgment could not create a lien throughout the State, we answer that such lien does not depend alone upon the adoption of the State law, but that it existed prior to and independent of such adoption. It was said, in reference to this point, by the court in the case already referred to of Doe ex dem Shrew and Winter v. J. D. Jones, (2 McLean’s Rep. 79,) that, “as land was not liable to be sold on executions or extended at common law, it is clear that at common law the judgment created no lien on the land of the defendant. But the argument is not sustainable that a judgment cannot operate as a lien, on real estate unless this effect be specially given to it by statutory provision. The statute of 2 West , 13 Ed. 1, gave the elegit which subjected real estate to the payment of debts, and this, as a consequence, it has always been held, gave a lien on the lands of the judgment debtor. 3 Salk. 212. 1 Wils. 39. 2 Leigh 268. 6 Randolph’s Rep. 618. 4 Peters 124. 2 Brock. 252. 2 Bl. Com. 418. 2 Bac. 731. 5 Peters 367. The same doctrine was held by the Supreme Court of this State, in a learned and able opinion in the case of Ridge v. Prather, 1 Black. 401. The court say, “We have always had a statute at least as strong as that of West. 2, by virtue of which judgments are liens upon real estate.” But until the act of 1818, there was no statute declaring that judgments should be a lien on real estate. ' In the view of the court such lien arose from the various acts subjecting lands to execution. The thirteenth section of the act of 1818, entitled “an act to prevent frauds and perjuries,” gives a lien on tbe real estate of the defendant from the time of signing the judgment. This statute, it would seem, was introductive of no new principle, but gave effect from a specified time to a judgment lien. It is unnecessary to enquire whether, prior to this time, the lien took effect from the commencement of the term or not: it is enough to know that it existed. The lien under this statute, as well as that which existed before the statute, being general, must have extended throughout the State. The circuit courts had power to to issue execution to any county in the State. And as their jurisdiction, thus to enforce their judgments, extended throughout the State, the lien must have been co-extensive with their jurisdiction.” We entertain no doubt therefore that, in either state of case, the judgment under which the complainants claim, operated as a lien upon the real estate of Tully throughout the State. The next and last objection urged by 4the defendant Byers to the title of the complainants, is, that the marshal’s deed, under which they claim, had not been acknowledged or admitted to record according to the requisitions of our statute. The act of Congress of May 7, 1800, section 3, provides that “Whenever a marshal shall sell any lands, tenements or hereditaments, by virtue of a process from a court of the United States, and shall die or be removed from office, or the term of his commission expire before a deed shall be executed therefor, by him to the purchaser, the purchaser or plaintiff at whose suit the sale was made, may apply to the court from which the process issued, setting forth the case, and assigning the reason why the title was not perfected by such marshal: and thereupon the court may order the marshal for tire time being to perfect the title and execute a deed to the purchaser, he paying the purchase money and costs remaining unpaid.” The complainants alleged in the petition and established all the facts necessary to authorize Rector, the successor of Newton, to execute and acknowledge the deed. They satisfied the court out of which the execution issued, that, after Newton had sold the property, and before he had executed a deed to themselves who were the purchasers, he was removed from office, and that Rector had been appointed his successor. The court, upon the showing, ordered Rector to execute the deed, which he did, and acknowledged the same before the'court. But it is also contended that, although the deed shall have been properly executed and acknowledged, yet it was not a fit subject for record in the office of the clerk of the Jackson Circuit Court. If any doubt could have existed as to the propriety and legality of recording the deed before the adoption of our execution law by the act of 1842, there certainly cannot now remain the least ground for such a doubt. Our statute, after providing for the execution and acknowledgment of deeds by the sheriff before the Circuit Court of the county, then declares that any deed so executed shall be recorded as other conveyances of land, and thereafter such deed, or a copy thereof, or of the record certified by the recorder, shall be received in any court in this State without further proof of the execution thereof. The act of Congress, by adopting this statute, though necessarily permitting a departure so far as the court before whom the acknowledgment should be made, does most clearly authorize its record in the county where the land is situated when so acknowledged. We have now carefully examined each objection urged by the defendant Byers against the claim set up by the complainants, and have not found the first one sustained by the principles of the law. We will next proceed to look into those raised to the claim of McDonald. The first point made in respect to this branch of the case, is, that the marshal, who conducted the sale at which Yan Groll-man purchased, was not clothed with legal authority to make such sale, and that consequently Van Grollman did not derive any title from it. If this position be correct, it will necessarily follow that McDonald, who deduces his title from Yan Grollman, will be left without any basis upon which to rest his claim. The act of Congress passed in 1800, is relied upon to sustain this position! The 3d section of that act provides “ that where a marshal shall take in execution any lands, tenements, or heredita-ments, and shall die or be removed from office, or the term of commission shall expire before sale, or other final disposition made thereof, the like process shall issue to the succeeding marshal, and the same proceedings shall be had as if such former marshal had not died or been removed, or the term of his commission had not expired.” The ground taken is, that, as the execution, under which the sale was made, was levied by Rector, and that, after his removal from office, the sale was conducted by Newton, his successor, it was void for want of authority, and that consequently no title passed to Grollman, the purchaser. It is contended, on the part of McDonald, that the ground assumed is not true in point of fact, but that, on the contrary, there is an utter failure by the record to show that any levy had been made by the predecessor of the marshal, who made the sale, or that in case it shall appear that such levy was made by him, it is then insisted that it was so made after his removal, and that, as such, it is a mere nullity. It is clear that, in case that the execution in question shall fall within the operation of the act of 1800, and the levy shall have been made by marshal Rector, or by his deputy, after his removal from office, that such levy was irregular, and could have been taken advantage of by the parties interested upon a direct application to the court for that purpose. Upon this point, we are not without authority. In the case of Overton & King vs. Gorham, & Dark, (2 McLean's Rep. 510,) the court say, “The 3d section of the act of the 7th May, 1800, provides “ that where a marshal shall take in execution any lands, tenements, or hereditaments, and shall die or be removed from office, or the term of his commission shall expire before or after sale or other final disposition made thereof, the like process shall issue to the succeeding marshal, and the same proceedings shall be had as if such former marshal had not died or been removed, or the term of his commission had not expired. From this provision, it is clear that the sale in this case was irregular. After his removal from office, the marshal, under the act of 1789, has power to execute all such precepts as may be in his hands; but the act of 1800 provides that his successor shall sell the lands on which he has levied but not sold before his removal. Notice to the late marshal of his removal was not necessary. His functions were terminated by the act of his removal. It appears, by reference to the testimony in the cause, that Newton was appointed on the 20th of April, 1841, and that the levy was made by Frazier, the deputy of Rector, on the 8th of May of the same year. The question now to be determined is, whether an execution thus circumstanced, is in full life, and clothes Newton with such authority as to enable him to pass title to the purchaser under his sale. The true test of a void process occasioned by an irregularity, is believed to be found in the rule laid down by Gould, I., in the case of Luddington v. Peik, 2 Cow. Rep. 702. He said, “The irregularity must be in the process itself or in the mode of issuing it: it cannot be irregular when sued out according to the established course of practice.” If the state of facts existing at the time the process issued, be such as to render it unlawful, that is sufficient. We are not to understand, by appearing irregular on the face of the process, that the irregularity is stated in the writ. It frequently appears by reference to extrinsic circumstances. Thus a writ tested and returnable out of term is irregular. When and where the terms are held by law, and how long the court was in session, is not stated in the writ, a knowledge of this is derived from other sources, and yet it may truly be said the writ is bad on the face of it. (See 1 Cow. Rep. 740.) We will now proceed to apply this test to the execution in question, It is not pretended that any obstacle existed in the way of its issuance at the time it first went forth; nor is it claimed that it bears any irregularity upon its face; but, on the contrary, it is conceded that it issued by authority and that it is fair and regular upon its face. But it is insisted that under the operation of the Acts of Congress it ceased to exist for all legal purposes, eo mstanti, upon the removal of marshal Rector, in whose time it was issued, and that consequently any action under it by Newton, his successor, was irregular and void. We do not so understand the operation of the acts referred to. The levy not having been made until after the removal of Rector, it is clear that the case cannot come within the operation of the Act-of 1800, and must of necessity fall within that of 1789. The latter act provides that “Every marshal or his deputy, when removed from office, or when the term, for which the marshal is appointed, shall expire, shall have power, notwithstanding, to execute all such precepts as may be in their hands respectively at the time of such removal or expiration of office, and the marshal shall be amenable, &c. If this be the correct construction it follows that the levy by Rector’s deputy was strictly legal and regular and that nothing more remains to be decided but the propriety and legality of the sale by his successor. Here we are met by the argument that as Rector possessed the power under the law to complete the execution of the writ, that therefore, Newton, his successor, could not legally do the same thing. We are free to admit that the sale made by Newton, under the circumstances, was irregular, and that upon a direct application to the court, by any of the parties interested, it would have been set aside; but it is by no means clear that the objection can be entertained in a collateral proceeding. The objection urged against thesaleunderwhichMcDonald claims title,is notfounded upon any defect in the execution itself; but, on the contrary, it is leveled solely at the individual who assumed to exercise the functions of an officer on that occasion. From the view which we have taken of the law as applicable to the execution in question, we are satisfied that the removal of Rector did not make the slightest impression upon it, but that it still retained all its vitality until exhausted by its full and final consummation. It is shown by the testimony that Newton was the marshal of the District at the time of the sale, regularly commissioned and qualified, and that, to say the least of it, if not de jure, he certainly stood in the attitude of marshal defacto to the writ under which he acted in making the sale. We conceive that every reason that could possibly obtain in favor of upholding sales, where mere irregularities not affecting the validity of the process itself had intervened, will apply with all their force to one situated like the one before us. The individual who conducted the sale was not only reported in the country as the marshal, but he was in truth and in fact the lawful officer duly commissioned and qualified to act as such. If the public under such a state of case should not receive the protection of the courts in their purchases, it would necessarily destroy all confidence in such sales and tend to the great and manifest injury of all parties concerned. We are therefore clear that the execution having issued by lawful authority, and there being no legal impediment to its full and final consummation, the most that the irregularity alleged could amount to, would be to render the sale voidable and not absolutely void, and consequently not liable to be assailed in a collateral proceeding. It is conceived unnecessary to notice the objection to McDonald’s title founded upon a supposed defect in the lien of the judgment under which Yan Grollman purchased, on the failure of the marshal to advertise or sell at the time and place prescribed by the State law, as all the ground in reference to those irregu-larites has been explored whilst answering similar objections to the title of the complainants in the original bill. The next point taken by the complainants is that Yan Grollman’s purchase being fraudulent as against the creditors of Tully, and McDonald being cognizant of such fraud before he consummated his purchase, their equity is paramount and consequently must prevail. We consider that it would be a waste of time and unnecessary labor to comment in detail upon all the evidence tending to fix fraud upon Yan Grollman in the purchase at the marshal’s sale, as the Current runs so strong in that direction as to leave no ground for a rational doubt upon that subject. The testimony is perfectly conclusive that Yan Grollman purchased the property for Tully’s use and benefit, and such being the state of fact, it is equally clear that in case McDonald was cognizant of the fraud before he consummated his purchase, that his claim must yield to that of the complainants. But if, on the contrary, he was abona fide purchaser for a valuable consideration, without notice, the judgment under which his vendor purchased being the oldest, his equity is necessarily prior to that of, the complainant’s and must prevail against it. But we are here met by the position that the answer of McDonald is insufficient in point of law, even admitting- the sufficiency of his proof to entitle him to the benefit of the defence setup by him, and the case of Boone v. Chiles, amongst others is relied upon. We will now proceed to look into tins matter, and to see how the case actually stands. In the case of Boone v. Chiles, 10 Peters Rep. 210-11, the court say: “It is a general principle .in courts of equity that where both parties claim by an equitable title the one who is prior in time is deemed the better in right. 7 Cr. 18. 18 J. R. 532. 7 Wh. 46; and that where the equities are equal in point of merit the law prevails. This leads to the reason for protecting an innocent purchaser holding the legal title against one who has the prior equity: a court of equity can act only on the conscience of a party: if he has done nothing that taints it, no demand can attach upon it, so as to give any jurisdiction. Sugden on Vend. 722. Strong as a plaintiff’s equity may be, it can in no case be stronger than that of purchaser who has put himself in peril by purchasing a title and paying a valuable consideration without notice of any defect in it or adverse claim to it: and when, in addition, he shows a legal title from one seized and possessed of the property purchased, he has a right to demand protection and relief. 9 Ves. 30, 4, which a court of equity imparts liberally. Such suitors are its most especial favorities. It will not inquire how he may have obtained a statute, mortgage, encumbrance, or even a satisfied term, by which he can defend himself at law, if outstanding; equity will not aid his adversary in taking from him the tabulo in non fragio, if acquired before a decree. Shower P. C. 69. 4 B. P. C. 328. 1 N. & E. 767. P. C. 65. 7 V. 576. 10 V. 268, 70. 11 F. 619. 2 Ch. Cas. 135-6. 2 Vin. 161. 1 Vent. 198. Relief will not be granted against him in favor of the widow or orphan. P. C. 249. 2 V. Jr. 457-8. 5 B. P. C. 292, nor shall the heir see ' the title papers. 18 Vin. 115. 1 Ch. Case 34, 69. 2 Freem. 24, 43, 175: it is a bar to a bill to perpetuate testimony or for discovery. 1 Harrison’s Ch. 261. 3 Sugden 723-4. 1 Vern. 354, and goes to the jurisdiction of the court over him: his conscience being clear, any adversary must be left to his remedy at law. 2 V. Jr. 457. 3 V. Jr. 270, 183. 9 V. 30. 18 J. R. 532. 7 Cr. 18. But this will not be done on mere averment or allegation; the protection of such bona fide purchase is necessary only when the plain tiff* has a prior equity, which can be barred or avoided only by the union of the legal title with an equity, arising from the payment of the money and receiving the conveyance without notice, and a clear conscience. It is setting up matter notin the bill; a new case is presented, not responsive to the bill, but one founded on a right and title, operating, if made out, to bar and avoid the plaintiff’s equity, which must otherwise prevail. 7 V. 33, 34. The answer setting it up is no evidence against the plaintiff, who is not bound to contradict or rebut it. 14 J. R. 63, 74. 1 Munf. 396-7. 10 J. R. 544-8. 2 Wh. 383. 3 Wh. 527. 6 Wh. 464. 1 J. C. 461. It must be established affirmatively by the defendant independently of his oath. 6 J. Rep. 559. 1 J. Rep. 590. 17 J. Rep. 367. 18 J. Rep. 532. 2 J. C. 87, 90. 4 B. C. 75. Amb. 584. 4 V. 404, 587. 3 J. C. 583. In setting it up by plea or answer, it must state the deed of purchase, the date, parties and contents, that the vendor was seized in fee and in possession; the consideration must be stated with a distinct averment that it was bona fiide and truly paid, independently of the recital in the deed. Notice must be denied previous to and down to the time of paying the money and the delivery of the deed; and if notice is especially charged, the denial must be of all the circumstances referred to from which notice can be inferred : and the answer or plea show how the grantee acquired title. Sugden 766-70. 1 Atk. 384. 3 P. W. 280-1, 243, 307. Amb. 421. 2 Atk. 230. 8 Wh. 449. 12 Wh. 502. 5 Pet. 718. 7 J. C. 67. The title purchased must be apparently perfect, good at law, a vested estate in fee simple. 1 Cr. 100. 3 Cr. 188-5. 1 Wash. C. C. 75. It must be by a regular conveyance; for the purchaser of an equitable title holds it subject to the equities upon it in the hands of the vendor, and has no better standing in a court of equity. 7 Cr. 48. 7 Pet. 271. Sugden 722. Such is a case which must be stated to.give a defendant the benefit of an answer or plea of an innocent purchaser without notice: the case stated must be made out, evidence will not be permitted to be given of any other matter not set out. 7 Pet. 271. We will now proceed to test the answer of McDonald by the rules thus laid down. He admits in his second amended answer that he was in possession of a portion of the lands described in the original bill, but avers that he obtained possession and derived his title to the same from one Herman Yan Grollman, that he purchased the same from said Grollman for a valuable consideration, that is to say, for the sum of sixteen hundred dollars, which ivas the full value and a high price for said lands, and that he had purchased and fully paid for said lands without any notice of any prior lien or encumbrance upon the lands, and without any notice or suspicion that the title of Grollman was tainted or in any wray affected with fraud. He further states that at the time of the marshal’s sale, under which Grollman purchased the property in dispute, he was not,a resident of Jackson county, and that he did not become a resident till some time after, that during his negotiation for said lands and purchase of the same, he heard nothing, nor did he hear any thing calculated to throw doubt or suspicion upon the title of Yan Grollman, and that he believed he -was getting a full, complete and perfect title, and that his purchase of the said lands is evidenced by a deed of conveyance from said Yan Grollman to him, which is already on file in this case and marked as exhibit C., in his answer to William Byer’s cross-bill herein, and which he prays may be taken as a part of this answer. He further states that, supposing his title to said lands to be valid and unquestionable, he has made valuable and permanent improvements thereon by erecting a dwelling house and out houses, clearing and fencing, &c., and that said improvements are worth at least one thousand dollars. He then sets out the proceedings under which Van Grollman purchased the lands, and then concludes this branch of his answer by exhibiting a copy of the marshal’s deed to him. The proferí of the deed from Van Grollman to McDonald, contained in the answer of the latter to Byers’ cross-bill, and to which reference is made in his second amended answer to the original bill, is as follows, to wit: “And this respondent says that the sale made by Grollman to himself is witnessed by a deed from said Grollman to him for conveyance of said lands, which deed is herewith filed and marked exhibit C., and prayed to be taken as a part of this answer.” This answer is clearly defective in failing to aver want of notice down to the delivery of the deed from Van Grollman to himself. But it is insisted that it is now too late to raise the objection since there is a general replication filed to the answer. This position might be correct as to matters of mere form, but it cannot be admitted where matters of substance are involved. A party is not allowed to state one case in a bill or answer and make out a different one by proof; the allegata and probata must agree. 4 Mad. R. 21, 9. 3 Wh. 527. 6 Wh. 468. 2 Wh. 380. 2 Pet. 612. 11 Wh. 103. 6 J. R. 559, 63. 7 Pet. 274, and also the case of Boone v. Chiles, already referred to at page 209. The reason is obvious, why such an averment is absolutely necessary in order that the party may fill the character of an innocent purchaser for a valuable consideration without notice. For if he had not obtained the deed, so as to become invested with the legal title, though he may have paid the last cent of the purchase money, his title was merely equitable, and as such would be subject to all the equities upon it in the hands of the vendor, and he would have no better standing in a court of equity. 7 Cr. 48. 7 Pet. 271. Sugden 722. The answer falls far short of the legal standard in several other particulars. It simply avers that Ms claimis founded upon a deed, but wholly fails to state its date or contents; nor is it stated that the vendor was seized in fee and in possession. These defects may or may not have been cured by the replication; and upon this point we express no opinion; yet it is certain that, to say the least, it would be much safer to adhere strictly to the rule laid down in framing an answer. We are satisfied, however, that by the failure of McDonald to aver want of notice of the fraud charged in the bill against his vendor down to the time of the delivery of his deed, his defence is incomplete, and that as such he must fail of success, and that without regard to the sufficiency of his proof. From this view of the case, it is clear that McDonald can occupy no better or higher ground than Van Groll-man, his vendor, and as a necessary consequence, if the complainants could have succeeded over the latter, they must be permitted to prevail in a contest with the former. It appears from the testimony on file in the cause that the instrument upon which the judgment of NeiF & Bro. was founded, and under which the complainants in the original bill setup their title was executed in March, 1839, and payable six months after date, and that the sale to Yan Grollman took place in 1841! From this it is clear that Neff & Bro. were creditors of Tully at the time of the sale to Van Grollman, and if such sale was made in fraud of their rights, it is equally clear that as to them it was void. The testitmony bearing upon this point is voluminous, and would require much time to comment upon the whole of it; yet we would forego all such considerations in case it presented any conflict, but we are saved the necessity by the fact that the whole current runs the same way, and is so strong as to leave no ground for a rational doubt. The fraud charged upon Tully and Grollman may therefore be considered as a fixed fact, and therefore if the effects of such fraud are to be extended to McDonald, it is clear that he cannot be sustained in his pretensions! The case of Sloval v. The Farmers’ & Mechanics’’ Bank of Memphis, is strongly in point, to show that the sale to Van Groll-man was fraudulent as to the creditors of Tully. The proof in that case was that means were resorted to which were calculated to prevent a fair competition in the sale, and that the party who actually purchased the property, was heard to say that he had done so for the benefit of the defendant in the execution. This, with the further evidence of continued possession, constituted the substance of the testimony in that case, upon which the court below found against the purchaser at the sale, and the appellate court affirmed the judgment. The suit in that case was prosecuted by the creditors themselves, and in that respect there is a difference between the two cases, and the question which results is whether parties claiming under a judgment of such creditor can claim the benefit of his position. This point was expressly ruled in the case of Hildreth v. Sands, 2 John. Ch. R. 35, which is quoted with approbation in the case of White v. Williams, 1 Paige Ch. R. 508. It is there said, “There is no doubt the complainant is in a situation to take advantage of the statute remedy. He is a bona fide assignee of the judgment, and had an equitable interest in it for his own protection, as endorser of the note, even before that assignment. As a purchaser of the premises, under the judgment, he is also entitled to all the rights which the judgment creditor could have. There can be no doubt, from the view which we have taken of the whole case, that the property claimed by McDondald is liable in his hands to the judgment of Neff & Brother, and the purchasers at marshal’s sale, under such judgment, being entitled to all their rights, it is equally clear that the complainants in the original bill acquired by such purchase a complete title as against Me Donald. This conclusion reached, it necessarily results that the claims of both Byers and Me Donald must yield to that of Fowler and the representatives of Denton, and that the decree of the court below is correct so far as it is confined to the question of title. It is urged that the decree is erroneous for the fact that the chancellor sustained the motion of Byers, to strike out the interrogatories contained in McDonald’s second amended answer. This answer charged a corrupt agreement between the defendants, Tully and Yan Grollman, and Denton, one of the complainants in the original bill, the purport of which was that Denton had bribed Tully and Van Grollman to leave the country, and decline answering the bill, so that the fraud charged against them might stand confessed, and thereby injure the claim of McDonald. We do not deem it material to inquire whether the matter called for'would be admissible in evidence or not, so as to aid the defence set up by Me Donald, as it is clear from the testimony In the record, that an answer by both Tully and Groll-man, positively denying every allegation in relation to fraud in the marshal’s sale, would have been fully and effectually disproved and overturned. The legal effect would have been the same, and consequently there is no ground of complaint in that particular. The next, and, as we conceive, the only remaining question important and necessary to be determined, relates to the proper disposition of the rents and profits and the improvements made upon the land; and also to the costs of suit. It is shown by the testimony that McDonald purchased on the 7th of January, 1842, and that the decree was taken against him on the 15th of June, Í 818, embracing a period of more than seven years; that at the time he entered upon the lands, there were from fifty to sixty acres in cultivation, and that it was woi'th from one to two dollars per acre per annum, and it also appears that the improvements which he had put upon the land were worth from one thousand to twelve hundred dollars. This bill was filed on the fifth of April, A. D. 1845, and more than three years after McDonald’s purchase. If it is allowable under the circumstances of this case to give to the party in possession compensation for his improvements, we most assuredly shall be inclined from our views of the testimony to do so, at least to the extent of the rents and profits claimed for the use and occupation of the land. The testimony tending to bring home a knowledge of the fraud to McDonald in the purchase of Van Grollman, is of the feeblest and most unsatisfactory character, and however obligatory we might have considered it upon the merits, from the fact of the finding of the court below, we cannot regard it as by any means conclusive when applied to the question of damages. Itis clearly the right of an innocent purchaser for a valuable consideration without notice to have the value of permanent and useful improvements set off against the claim of the rightful owner to the extent of the rents .and profits. This doctrine is distinctly laid down by the Supreme Court of New York in the case of Jackson v. Loomis, 4 Cowen Rep. 172. That was an action of trespass for mesne profits. The court in that case say, “There is certainly no reason, in general, why the owner of lands should be compelled to pay for improvements which he neither directed nor desired as a condition on which he is to gain possession of his property. But where an occupant has taken possession under a bonafide purchase and made permanent improvements, it is very hard for him to lose both land and improvements. If the plaintiff is not content with acquiring possession of his property in an improved condition after he has neglected to assert his title for a number of years, it is certainly equitable that the defendant should be allowed the value of his improvements made in good faith to the extent of the rents and profits claimed. “This view of the subject is fully supported by Green v. Biddle, (8 Wheat. Rep. 81, 82,) and the authorities there cited, especially Coulter's Case, (5 Co. Rep. 30.) Most clearly the defendant should not be compelled to pay an enhanced rent in consequence of his own improvements.” The Supreme Court of the United States, in the case of Green v. Biddle, (5 Cow. Rep. 385,) when commenting upon the Kentucky statutes concerning occupying claimants of land, and declaring the common law rule in relation to damages recoverable by the rightful owner, say, “It is laid down, we admit, in Coulter's Case, 5 Co. 30, that the disseizer, upon a recovery against him, may recoup the damages to the value of all that he has expended in amending the houses. See also Bro. tit. Damages, Pl. 82, who cites 24 Edw. 3, C. 50. If any common law decision has ever gone beyond the principle here laid down, we have not been fortunate enough to meet with it. The doctrine of Coulter's Case is not dissimilar in principle from that which Lord Kains considers to be the law of nature. His words are, “It is a maxim suggested by nature that reparations and meliorations bestowed upon a house, or on land, ought to be defrayed out of the rents. By this maxim we sustain no claim against the proprietor for meliorations, if ihe expense exceed not the rents derived by the bonae fidei possessor.” He cites Papinian 1, 48, de rei vindications'. Taking it for granted that the rule, as laid down in Coulter's Case would be recognized as good law by the courts of Virginia, let us see in what inspects it differs from the act of Kentucky. That rule is, that meliorations for the property (which necessarily mean valuable and lasting improvements) made at the expense of the occupant of the land, shall be set off against the legal claim of the proprietor for profits which have accrued to the occupant during his possession.” It is clear that the testimony in this case, under the rule thus laid down, will not warrant the decree in respect to damages. The improvements made by McDonald, consisted of dwelling houses, kitchen, negro cabins, corn-cribs, stakes, clearing land, digging well, &c. James Robinson testifies that the improvements made in 1842, 3 and 4, were worth six hundred dollars, and that those made in 1845-6 and ’47, were worth three hundred dollars. It was also testified by others that all the improvements were worth from one thousand to twelve hundred dollars. The improvements specified were doubtless of a permanent and beneficial nature, and the defendant McDonald having entered in good faith, so far as the testimony shows, he is clearly entitled to have a deduction in consideration of his improvements made before suit brought, to the extent of the rents and profits claimed. McDonald purchased on the 7th of January, A. D. 1842, and according to the evidence, as found by the Chancellor, the rents and profits did not exceed the sum of seventy-five dollars per annum. The improvements made anterior to the 5th of April, 1845, the commencement of this suit, were proved to have been worth six hundred dollars, and the rents and profits down to that time at the same rate could not have exceeded two hundred and forty-three dollars and seventy-five cents, which of course would leave the sum of three hundred and fifty-six dollars and twenty-five cents, to be set off against such rents and profits as shall have accrued since that period. This suit having been commenced on the 5th of April, A. D. 1845, and a final decree having been rendered on the 15th June, A. D. 1848, embracing about three years and two months, the rents and profits during- that time could not have exceeded two hundred and thirty-seven dollars and fifty cents according to the rate fixed, which would be minus the value of the improvements made before suit brought just one hundred and nineteen dollars and seventy-five cents. This latter sum he cannot claim, as the time of the institution of the suit which operates as notice of an adverse claim to the land is his limit of recovery by way of compensation, and that recovery is strictly confined to improvements made in good faith before the institution of the suit. It was said, by Kent, Justice, who delivered the opinion of the court in the case of Murry v. Gouverneur, (2 John. Case 441, 2 in error) that as to the sum expended, it may be left for liquidation in an action for the mesne profits, if the respondents- should think proper to sue for mesne profits. The action for mesne profits is a liberal and equitable one, and will allow of every kind of equitable de-fence. It was also held in Pennsylvania, (Hylton v. Brown, C. C., April, 1818. Whart. Dig., Ejectment, 1 Pl.p. 188. U. S., Reports) that “the value of improvements made by the defendant may be set off against a claim of mesne profits, but profits before the demise laid should be first deducted from the value of the improvements. We entertain no doubt but that the defendant McDonald was entitled to compensation for improvements made before suit brought, and in case they are equal in value to the rents and profits claimed to set them off to the entire extinguishment of such rents and profits. This having been already ascertained it necessarily follows that he ought to be discharged and released from that part of the decree which awards damages against him. The last point to be considered relates to the proper disposition of the costs. From the testimony contained in the record, we think that there can be but little pretence that McDonald was cognizant of the fraud with which the title of his vendor was tainted, at the time he made his purchase. It is in proof that he did not reside in the county of Jackson at the time of the marshal’s sale to YanGrollman, and that he did not, settle in that county till some time thereafter, and there is certainly no evidence of a reliable character going to establish a knowledge of such fraud after he went into Jackson, and before his purchase. We feel satisfied from the fact of his absence at the time of the marshal’s sale, the dearth, of the evidence to bring a knowledge of the fraud home to him after he went into Jackson county, and from the price which he paid for the property, as well as the secret character of the defect in his title, that his purchase and entry were in good faith. This being the case, though he failed upon the merits, and perhaps more from a defect in his answer than the insufficiency of his proof, we cannot believe that it would be consonant with the principles of equity and conscience to visit upon him more costs than he may have incurred in defending this suit. We are therefore of opinion that the whole of the decree rendered in this cause, except so much as awards damages and costs against McDonald, ought to stand; but that so much as gives damages and costs against him ought to be reversed, and that the same as to costs be so entered as only to allow such costs as he may have himself incurred in his defence of this suit in the court below and also in this court; and also that the complainants in the original bill pay all their costs in both com’ts. It is therefore, ordered, adjudged and decreed, that the decree rendered by the Chancellor in the court below, except so far as it relates to the damages and costs adjudged against the said McDonald, be and the same is hereby affirmed, and that said decree as to the said damages and costs be and the same is hereby reversed and held for nought, and that the said McDonald be discharged and released from the same, and further, that so much as relates to costs as against him be reversed and held for nought, and the said McDonald pay all such costs as he may have incurred in his defence against the said original bill in this court as well as in the court below, and that the complainants pay all such costs as they may have incurred in the prosecution of said original bill against the said McDonald in both courts. A petition for reconsideration was filed by McDonald, and overruled.